# EXHIBIT D

## EXCERPTS OF QBE 30(B)(6) DEPOSITION

**13:24**

Q.        What is the scope of your authority to act on behalf of QBE Insurance Corporation?

MS. SIMS:  In this case?

BY MR. GINSBURG:

Q.        We'll start off with in this case.
A.        I was the file handler from the beginning to the end.  The file is under my control, always has been.  So to the extent that anything goes on in this file, I am the person with the most knowledge.
Q.        What are your duties and responsibilities as the managing general agent for QBE Insurance Corporation?

MS. SIMS:  I'm going to object.  He can  answer that in his individual capacity as a claims adjuster.  He's the person and the representative for anything having to with the claim. To the extent you're asking for someone to    speak on behalf of Florida Intracoastal Underwriters or QBE with respect to the relationship between those companies, there may be other individuals that have more knowledge  than Mr. O'Brien in those areas.  But he can explain as far as he can go with that, but he's not been appointed as a corporate rep on that particular topic.

**15:20**

Q.        Okay.  You received the renotice of taking deposition of QBE Insurance Corporation pursuant to Federal Rule of Civil Procedure 30(b)(6)?
A.        Yes.
Q.        Have you been designated by QBE Insurance Corporation as the person with personal knowledge to appear for the purpose of testifying to each of the matters listed in Exhibit 2?
A.        No.  I wouldn't be to some of those items, no.
Q.        Okay.  Prior to today, did you read the subjects of the deposition contained in Exhibit 2?
A.         Yes.
Q.        Okay.  And you're not here to testify on all of the enumerated topics in Exhibit 2?
A.        Well, there's a number of them which I would not be the person, that's correct.
Q.        Okay.  Which ones require other witnesses?
A.        Number 1, No. 2.
Q.        I'll tell you what, since you're starting off with 1 and 2 consecutively, could you tell me, if you know, as you tell me which ones you're not qualified to testify to and other witnesses should be, who those witnesses are?

MS. SIMS:  And, if you don't appreciate me trying to interject, I'm just trying to do this for clarity, but I will not speak if you prefer it that way.  But when he's talking about being  the person for QBE, he may be the person at QBE with the most knowledge of some of these areas.  But some of these areas, because we're in subrogation, it would have to be something from  the Club, so that that's clear.  So he may - if you want him to say whether he's the person with the most knowledge at QBE, but not the most knowledged at all, then he can clarify it that way.

MR. GINSBURG:  Okay.  To answer your first  question -- comment, I would prefer that the witness answer the question to the best of his ability, and we'll go from there.  But let's back up.

BY MR. GINSBURG:

Q.  And the question is:  With respect to each of the enumerated topics in Exhibit 2, which ones are you not here for the purpose of testifying to?

A.  Well, again, that kind of depends on exactly the question that was posed.  Are you asking for the person with the most knowledge at QBE or the person with the most knowledge as to the plaintiffs, period?  If it's with regards to QBE, then I am the person.

Q.  Okay.  But in this case, QBE is standing in the shoes of two other entities as well.  Do you understand how that works?

A.  Yes.

Q.  Okay.  They are the assignee of the Club at Brickell Bay Plaza Condominium Association, Inc., and they are the assignee of Brickell Bay Plaza, LLC, and have sued as the assignee in both instances as well as on its own behalf.  Do you understand that?

A.  Yes.

Q.  Okay.  And under the Federal Rules of Civil Procedure that you were noticed for a deposition or QBE was noticed for a deposition for today, the rule says that "The organization must designate one or more officers, directors or managing agents or designate other persons who consent to testify on its behalf.  And it may set out the matters on which each person designated will testify.  The persons designated must testify about information known or reasonably available to the organization."  Do you understand that?

A.  Yes.

Q.  Okay.  So going back to Exhibit 2, as far as I know, you were the only person designated to testify in response to Exhibit 2.  Please tell me which, if any, of the enumerated topics in Exhibit 2 you're not here to testify on.  And while you do that, if you know who the proper person is, just please identify that person.

A.  Okay.  Well, again, that would be No. 1. My guess is the person would be Wilfredo, since he was the maintenance person at Club at Brickell Bay Plaza at the time.   Number 2, again, I would believe that would be Wilfredo because it's asking who contacted the maintenance people at Brickell Bay, or Chris Cedeno.   Number 3 I can answer some questions on, because, obviously, I was a part of that.  I don't know that I would be the best person.  Again, that probably would be between Wilfredo and Sherri at SEA.  Number 4, would be me, except to the extent I don't know what some of those documents are.  I mean, I would be the person with the most knowledge in regards to the documents investigation of the claim file, but the items that are referred to there, the Penabella Supplemental Report, I don't know what that is.  I'm not certain about No. 5.  I would have to see the copy of the second amended complaint from the original lawsuit to know what those items are as to whether I'd be that person.  Number 6 I would be the person.  Number 7I would not be the person.  I would guess that would be, again, Wilfredo or Chris or possibly Steve Baer.  Number 8 I would not be the person.  I don't know who would be.  Number 9 I would be.  Ten I would think I would be.  I would have to see the specific requests.  Number 11 I would be.  Number 12 I would be.

Q.  And then there's a series of additional topics beginning on page 6 all of which pertain to electronically stored information, document as opposed to electronic retention, and the custodianship of documents and information, systems, policies and procedures of QBE.  Would you be the person to testify in those subject matters?

MS. SIMS:  Object to form.  You started  off, if you look at page 6, 1 and 2, those are not going to QBE.

BY MR. GINSBURG:

Q.     Well, for definition of purposes, so I don't spend all day asking the question with multiple names, when I say "QBE" today, or I say "you," I'm referring to QBE Insurance Corporation as assignee of Brickell Bay Plaza, LLC, and the Club at Brickell Bay Condominium Association, Inc. Do you understand that?

A.     Yes.

Q.     Okay.  So there's a series of additional subject matters covered beginning at page 6 in Exhibit 2 continuing through Item 35 on page 10 of Exhibit 2.

MS. SIMS:  Why don't you just read through  them and tell us if you can speak to any of  them.

THE WITNESS:  Well, I would not be the person in regards to any areas of electronic retention for QBE, period.

BY MR. GINSBURG:

Q.     And when you say "QBE," you're including my definition of the Club at Brickell Bay Condominium Association, Inc., and Brickell Bay Plaza, LLC?

A.     That's correct.

Q.     Okay.  And what about documents storage and retention for all three of those entities:  QBE Insurance Corporation, the Club at Brickell Bay Condominium Association, and Brickell Bay Plaza, LLC?

A.     I would have no information on that.

Q.     As of today, QBE has not designated anyone else who can provide testimony on those matters listed in Exhibit 2 which you just told us you're not familiar with or able to testify about; is that correct?

A.     Yes, I believe that's correct.

Q.     Okay.  Did you discuss with any of the people you named, and I believe it was Wilfredo Fernandez, Chris Cedeno, Sherri Hankal and Steve Baer, on items in Exhibit 2 that you're not the proper person to testify about whether they would consent to testify on those subjects?

A.     No.

Q.     Okay.  You understand that you're here today to testify to both facts within the knowledge of QBE and the opinions and subjective beliefs of QBE, including its interpretation of events and documents?

A.     Yes.

Q.     Okay.  Did you discuss, or did anyone discuss with you, whether or not you should be the person to appear to answer the matters listed in Exhibit 2?

A.     Yes.

MS. SIMS:  Don't –

BY MR. GINSBURG:

Q.      Without telling me any conversations you had with your lawyers, you can tell me if you
        discussed that generally with lawyers or some other third party.  Do you understand my
        question?

A.      No.

Q.      Okay.  You told me you had a discussion concerning matters listed in Exhibit 2.  So the question
        is:  Other than your lawyers, did you have that discussion with anybody else?

A.      No.

Q.      Okay.  And you discussed those topics, without telling me the substance of the discussion, you
        discussed those topics with your lawyers?

A.      That's correct.

Q.      Okay.  What did QBE do to prepare you to fully and unevasively answer the questions about the
        subject matters in Exhibit 2?

A.      We went through them individually, the entire notice in the areas for the questions.

**25:11**

Q.      Without telling me the substance of any conversation you had with your lawyers, how much
        time did you spend speaking with your lawyers to prepare for this deposition?

MS. SIMS:  If you know.

THE WITNESS:  I would say probably three; three, four hours.

BY MR. GINSBURG:

Q.      Did you speak to anyone from the Club at Brickell Bay Plaza Condominium Association, Inc., to
        prepare for this deposition?

A.      No.

Q.      You didn't interview anybody on the board of directors of the Club at Brickell Bay Plaza
        Condominium Association, Inc., to provide any responses at this deposition?

A.      No.

Q.      Did you interview any employees from the Club at Brickell Bay Plaza Condominium Association
        to provide responses at this deposition?

MS. SIMS:  All right.  You're getting into work product.  You're asking him what -- he has  the assignment
with the Club.  You're asking him what conversations he had with people.  That is all work product.  I
don't believe that you're entitled to go into everything he did as far as who he's spoken to at the Club,
any conversations, what they were about.  I think you're getting into work product.

MR. GINSBURG:  I'm going to ask the reporter to read back the question the way I asked it.  If you're
going to instruct him to answer, then instruct him to answer -- not to  answer based on whatever
privilege you're asserting.  I really disagree with that.

MS. SIMS:  Yes.  I'm sure you do or you  wouldn't be asking.

(Thereupon, the Court Reporter read back the last question.)

MS. SIMS:  You can answer.

THE WITNESS:  No.

BY MR. GINSBURG:

Q.      What records of the Club at Brickell Bay Plaza Condominium Association did you review to provide responses at this deposition?
A.      None.
Q.      Did you speak to anybody from Brickell Bay Plaza, LLC, to prepare for this deposition?
A.      Well, let me go back to that question.  To the extent any of them were supplied as part of the underlying case, I reviewed my entire file previously.  So all the documents that were submitted in support of the claim I reviewed.
Q.      Did you speak to anyone from Brickell Bay Plaza, LLC, to prepare for this deposition?
A.      No.
Q.      You didn't interview anyone on the board of directors of that limited liability company or its employees to provide responses to this deposition?
A.      No.
Q.      And other than documents you may have received in the course of what you call the underlying case, which I interpret to mean the coverage dispute that you had, did you review any documents or records of Brickell Bay Plaza, LLC, to prepare for this deposition?
A.  No.

**83:16**

Q.      Did you conduct any investigation before coming here today in order to be able to answer questions on behalf of the Club at Brickell Bay Plaza Condominium Association, Inc., about any deficiencies in the air-conditioning system?

MS. SIMS:  Object to form.

THE WITNESS:  No.

**112:2**

Q.      Well, what were the procedures and practices that were followed concerning maintenance and repair to the HVAC system by the developer and condominium association?
A.      I don't know.

**112:21**

Q.      Okay.  Did you independently, through QBE, ask anybody at the condominium association what the procedures were for emergencies, natural disasters, hurricanes, pipe bursts, and valving off?
A.      I did not, no.
Q.      Did you ask anybody at Brickell Bay Plaza, LLC, about those procedures?

MS. SIMS:  Object to form.

THE WITNESS:  No.

**124:19**

Q.      The next subject in the deposition notice, No. 2 -- Exhibit 2, Item 2, relates to residents and other persons present during Hurricane Katrina who contacted or observed maintenance personnel at the property or observed property damage, flooding or pipe bursts.  Are you the person with the most knowledge from QBE about this?

A.      From QBE, yes.

Q.      Are you able to speak on behalf of the condominium association and the developer who are QBE's assignors in this case?

A.      No.

Q.      Who is?

A.      Other than Wilfredo or Chris or Steve, I don't know who else that would be.  I mean, it says "residents."  So I don't know that any of those three would qualify for that.  I don't know who would be the best person to be able to tell that.

Q.      Did you ask if any of them would consent to testify as QBE's designated representative at today's deposition?

MS. SIMS:  Object to form.  You mean him personally?

MR. GINSBURG:  He's speaking on behalf of QBE.

MS. SIMS:  Well, okay.  QBE directly and not through counsel, go ahead.

THE WITNESS:  No.

**127:16**

Q.      So, as QBE's representative, you don't know, as you sit here today, what time Hurricane Katrina came and left Miami on August 25th, 2005?

A.      No, I do not.

Q.      Okay.  But you're using Hurricane Katrina as the reason why the water loss and pipe separation wasn't discovered earlier, correct?

MS. SIMS:  Object to form.

THE WITNESS:  We're using it as a reason why you wouldn't expect somebody to go on the roof to have located the leak faster than it happened, yes, that's correct.

BY MR. GINSBURG:

Q.      If the hurricane was gone before 11:00 p.m., at what point in time would you draw the line for somebody not going on the roof to discover a pipe separation?

MS. SIMS:  Object to form.

THE WITNESS:  I don't know exactly what time that there was no more winds or rains or any aftereffects associated with Katrina that left.  I don't know the exact time that it finished completely.

6

BY MR. GINSBURG:

Q.     These were the winds and rains that were not strong enough to move the pipe to separate, correct?

MS. SIMS:  Object to form.

THE WITNESS:  That were not strong enough to lift an entire tank and move it, yes, that's correct.

BY MR. GINSBURG:

Q.     That wasn't my question.  I said to separate the pipe.
A.     Separate the pipe, yes, that's correct. Because my understanding, from speaking with Sherri, in order to separate that pipe, you would have had to have the whole unit move.
Q.     Are you aware that a resident first reported the water to the lobby desk before midnight on August 25th, 2005?
A.     No.

MS. SIMS:  Object to form.

BY MR. GINSBURG:

Q.     Did you interview any residents?
A.     Not any residents, no.

**131:17**

Q.     Showing you Exhibit 24, did you produce these to Jorda in this case?
A.     I don't know.
Q.     Did you ever see them before?
A.     I don't know that I specifically recall this specific document, no.
Q.     You don't recall ever reading it before?
A.     I mean, there's thousands of documents.  I don't recall this specific one, no.
Q.     What did QBE do to investigate any images captured by the security cameras during the night of August 25th and 26th of 2005?
A.     I don't believe anything.
Q.     Do you know what the association or the developer did to preserve those images?
A.     I do not.
Q.     Do you know why they haven't been produced?
A.     I don't know if they exist.
Q.     Did you ever ask anybody?
A.     No.
Q.     Don't know where the films are?
A.     No.  I would assume they're taped over, if they're not asked for within a certain period of time.

**159:24**

Q.  In Exhibit 2, the notice of taking deposition, the next matter that we wanted to inquire about of QBE was "everything that QBE and Brickell Bay Plaza, LLC, and the Club at Brickell Bay Condominium Association, Inc., know about persons who were responsible for or observed and/or handled the HVAC pipe which separated or caused flooding, the chain of custody of the pipe and other components and the preservation of physical and documentary evidence." Do you see that?

A.  Not yet.  Which number?

Q.  Number 3.

A.  Okay.  Yes.

Q.  Are you the person who knows the most about this subject?

A.  Yes.

Q.  Who took the pipe from the mechanical room on August 26th, 2005?

A.  I don't know.

Q.  Where was the pipe between August 25th, 2005, and September 9th, 2005?

A.  That I don't know either.

Q.  Who handled the pipe during that period of time?

A.  I don't know.

Q.  Who had custody of the pipe during that period of time?

A.  I don't know.

Q.  What documents exist to show the chain of custody from the time that the pipe separated on August 26th, 2005, and it arrived at SEA?

A.  I don't have any.

Q.  Did anyone examine the pipe prior to October 19th, 2005?

A.  I don't believe so.

**170:22**

Q.  Did QBE ever get all of the documents from either Brickell Bay Plaza, LLC, or the Club at Brickell Bay Condominium Association, Inc., or were there several documents that remained missing and unaccounted for at the time you settled your case with them?

A.  I don't know.  I would say that we must have had a substantial number, if not all of them, or it would have been something that would have been still continuing to linger at that time.

**171:14**

Q.  I'm showing you what's been marked as Exhibit 35.  Have you seen this before?

A.  No.

Q.  Do you know what it is?

A.  Looks like a series of e-mails that have to do with water intrusion in units owned by Sebastian.

Q.  Did you know that the Club at Brickell Bay set up a customer service representative to receive inquiries and information from residents during the aftermath of the water damage on August 26th, 2005?

MS. SIMS:  Object to form.

THE WITNESS:  No, I don't know that I knew  that.

8

BY MR. GINSBURG:

Q.      Does it appear that there was a separate e-mail address and website for customer service?
A.      Well, it definitely indicates there was a customer service representative.
Q.      And that customer service representative had an e-mail address that included support at the clubatbrickellbay.com?
A.      Yes.
Q.      And you meaning, QBE, had not learned of its existence until today?

MS. SIMS:  Object to the form.

THE WITNESS:  I said I have not seen this.  Whether or not it was reviewed in concert with      counsel in going over the documents that were  produced, it's possible.  Again, there's  thousands of documents, I don't know.

BY MR. GINSBURG:

Q.      Wouldn't the information from residents or sent to the customer service representative been of interest to QBE in processing and evaluating the loss in the insurance claim?

MS. SIMS:  Object to form.

THE WITNESS:  Potentially, yes.

**175:16**

Q.      Going back to Exhibit 28, the June 26th, 2008, settlement agreement, what was QBE's involvement in that settlement agreement prior to June 26, 2008?
A.      I don't know the answer to that question.
Q.      Is there somebody else who does?
A.      I don't know who that would be.
Q.      When did QBE first learn of the approval of the settlement agreement by the board of directors of the Club at Brickell Bay Plaza Condominium, Inc.?
A.      I don't know the answer to that question either.
Q.      Did QBE make any attempt to insert subrogation language in the settlement agreement?

MS. SIMS:  Object to form.

THE WITNESS:  I don't know.

**184:22**

Q.      Did the scope of work in settlement agreement call for Jorda to perform work in consideration for settlement?
A.      I believe that's the one I said I wasn't aware of.

9

**187:11**

Q.      And Jorda performed the HVAC portion of the repairs on this schedule, didn't it?
A.      I don't know.
Q.      Did you ask anybody at the condominium association in order to answer that question?
A.      No.
Q.      Did you ask anybody at the developer in order to answer that question?
A.      No.
Q.      Do you have any reason to dispute that Jorda performed the HVAC portion of the repairs on the schedule in Exhibit 41 as part of its settlement agreement in the state court's litigation?
A.      No, I have no reason to dispute that.

**188:18**

Q.      Who's the person with the most knowledge concerning HVAC during construction?

MS. SIMS:  Object to form.

THE WITNESS:  During construction of the  building?

BY MR. GINSBURG:

Q.      Yes.
A.      When you say "who's the person," are you talking about anybody in general or somebody at the building, somebody at QBE?
Q.      Well, you're testifying here as the representative for QBE, the association, and the developer.

MS. SIMS:  No.  We're producing someone  else for the association, developer.  We're trying to -- we've told you that.  We can only speak as to QBE.

MR. GINSBURG:  You never told me that, Melissa.  I've been asking for designations for two months.

MS. SIMS:  And as you know, we've been trying to get one from the attorney.  We're calling him on a daily basis trying to find out who that person's going to be.  I've always intended to produce somebody separate.

MR. GINSBURG:  This is the first I'm hearing of it.

MS. SIMS:  Well, then I think there's been a miscommunication.  He can only say what QBE knows.  Their role is limited.  You're going to get somebody else for the association.

MR. GINSBURG:  Can you give me a clue as to when you are going to tell me who that somebody else is?

MS. SIMS:  If I knew, I would be telling you.  Are we making every effort to get that person's name?  Yes.  I can only do what -- I can't go in there with, you know -- but our intent is to have someone separate for that, and we will get someone separate for that.

**190:22**

Q.    Do you know who the person would be with the most knowledge concerning HVAC during the construction?

A.    No.

Q.    Do you know who scheduled the HVAC installation?

A.    No.

Q.    Do you know anything about the quality control inspections during construction?

A.    No.

Q.    Do you know if there were quality controls existing during construction?

A.    No.

Q.    Would that have been something QBE should have been concerned about in investigating the claim and any apportionment of fault?

MS. SIMS:  Object to form.

THE WITNESS:  Could it be of relevance?   Yes.

BY MR. GINSBURG:

Q.    Did Brickell Bay Plaza or Beauchamp use any type of inspection checklist to document the quality of construction?

A.    I'm sure they did.  I don't know.

Q.    You didn't ask anybody?

A.    No.

Q.    You didn't ask anybody about any quality control standards or quality control inspections or inspectors?

A.    No.

Q.    You never reviewed any inspection sheets for the construction?

A.    No.

Q.    Did you ever review any documents regarding the quality control engineering firm that passed all of Jorda's work?

A.    No.

Q.    Did you ever look at any specific list of deficiencies that were ever found attributable to the HVAC contractor?

A.    No.

Q.    Did you ever ask anybody whether such a list existed?

A.    No.

Q.    Do you know whether the Club at Brickell Bay Condominium ever had construction defect problems prior to the August 25th hurricane 2005?

A.    If they had any construction building defects at all?

Q.    Prior to the hurricane on August 25th, 2005.

A.    I don't know.

**199:9**

Q.      Who oversaw the repairs made after the 2005 hurricane?
A.      I don't know what you mean by who oversaw them.  From the insured?  From the developer?
        From my perspective?  I don't know.
Q.      Well, you're answering on behalf of all three today, so what can you tell me?
A.      I won't be answering on behalf of all three.  I'll be answering on behalf of QBE.

**199:21**

Q.      Do you know who oversaw the repairs on behalf of the developer and the condominium
        association?
A.      No.

**241:12**

Q.      Okay.  The next item in the Exhibit 2 notice of taking deposition is Item 8 regarding the change
        of construction from the apartment to a condominium and the agreements or consent of
        subcontractors to that change.  Are you the person with the most knowledge from QBE on that
        subject?
A.      From QBE, but I would have no knowledge of that.
Q.      And you didn't ask anybody at the association or the developer?
A.      No.
Q.      So you know nothing about the decision or approval to change the construction to a
        condominium?
A.      No.
Q.      And you didn't ask anybody about it before you came here today?

MS. SIMS:  Object to form.

BY MR. GINSBURG:

Q.      Right?
A.      No.
Q.      I'm not right or right?
A.      No, you're right, I didn't ask anybody.

**242:11**

Q.      Okay.  There's a series of matters that we wanted to inquire about QBE that begins on page 6 of
        Exhibit 2 and continues through with 35-numbered subjects relating to the retention and
        destruction of documents and electronically stored information.   Are you the person with the
        most knowledge from QBE about those two subjects?
A.      No.

**243:20**

Q.      Who's the person with the most knowledge of the retention and destruction of documents for QBE?

A.      I don't know who that person would be at QBE.

Q.      You didn't ask anybody before you came here?

A.      No.

Q.      Who would be the person with the most knowledge of the retention and destruction of documents at the Club of Brickell Bay Condominium Association, Inc.?

A.      I don't know.

Q.      You didn't ask anybody before you came here?

MS. SIMS:  Object to form.

THE WITNESS:  No.

BY MR. GINSBURG:

Q.      Who would be the person with the most knowledge of the retention and destruction of documents at Brickell Bay Plaza, LLC?

A.      I don't know.

Q.      Did you ask anybody at that entity before you came here today?

MS. SIMS:  Object to form.

THE WITNESS:  No.

BY MR. GINSBURG:

Q.      Who would be the person with the most knowledge of the retention and destruction of documents at Florida Intracoastal?

A.      Cathy Roberts.

Q.      What is her title?

A.      Vice president of operations.

Q.      Where is she located?

A.      In the same office on Sunrise that I am.

Q.      Did you discuss with her you're appearing for deposition today?

A.      No.

Q.      Did you discuss with her any of the subject matter in Exhibit 2's notice of taking deposition?

A.      No.