**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Case No. 10-21107-CIV-GOLD/GOODMAN**

QBE INSURANCE CORPORATION,

      Plaintiff,

v.

JORDA ENTERPRISES, INC.,

      Defendant.

_____

**ORDER ON DEFENDANT'S MOTION FOR**

**SANCTIONS FOR FAILURE TO COMPLY WITH RULE 30(B)(6)**

      This cause is before me on Defendant's Motion for Sanctions for Failure to Comply With Rule 30(b)(6). (ECF 70). The Court has reviewed the motion, Plaintiff's response (ECF 75) and the post-hearing submissions. The court also held a comprehensive hearing on January 6, 2012. For the reasons outlined below, the Court **grants in part and denies in part** the motion.

## I.    Introduction

      This motion requires the Court to confront the following issue: what consequences should flow from a plaintiff insurance company's failure to designate a witness to bind the corporation under Fed. R. Civ. Pro. 30(b)(6) when (1) it lacks knowledge of several topics listed in the corporate deposition notice because it is pursuing a subrogation claim assigned to it by its insured, (2) it has no material of its own to review for certain topics and has no employees or agents with the requisite knowledge, (3) it cannot prepare a designee on certain topics because the insured (who presumably does have knowledge of the issues) refuses to cooperate with the

insurer even though it received payments and is under a contractual obligation to cooperate, and (4) the discovery deadline has expired?

There is surprisingly little authority on this question, though there is authority on a more-common question which is *also* present in the motion: what happens if a party fails to adequately prepare its *own* designee, who does not review all available materials, and the sole designee proclaims that he is not being produced to provide testimony on some of the topics listed in the notice?

As outlined below in the factual background section of this Order, Plaintiff QBE Insurance Corp., which is pursuing a subrogation claim against Jorda Enterprises, Inc., a plumbing subcontractor, after paying more than $3 million on a water damage claim to an insured condominium association, is embroiled in *both* types of scenarios.

First, in response to a 30(b)(6) corporate deposition notice listing 47 topics, QBE produced one witness, a claims examiner, and announced for the first time at the deposition that its designee did not have knowledge on many issues but agreed to produce another corporate representative who would have the requisite knowledge.  QBE intended to secure one or more representatives from the insured condominium association, but that plan was thwarted. Nevertheless, the one representative it did produce was unable to adequately answer questions on many topics and he reviewed only a small portion of the documents which QBE had or had access to before the deposition.

For this first scenario, *sanctions* are appropriate. Because the discovery deadline has expired, because QBE did not fulfill its obligation to properly prepare its own designee, because QBE waited until the corporate representative deposition began to give notice of its designee's partial inadequacy and because its designee could have (but did not) review substantially more

material in order to be a more-responsive witness, Defendant's requested sanction will be imposed. Specifically, QBE will be precluded from offering any testimony at trial on the subjects which its designee was unable or unwilling to testify about at the 30(b)(6) deposition.

Second, because this is a subrogation case, QBE is not directly familiar with many of the underlying facts and was relying on its insured to consent to be the corporate representative designee for many of the issues listed in the 30(b)(6) corporate deposition notice. According to QBE, but for reasons not provided to the Court, the insured has refused to cooperate with QBE, even after receiving a written demand threatening to sue the insured condominium association for breach of the cooperation clause in the insurance contract.

For this second scenario, the *result* will be the same -- precluding QBE from introducing any testimony at trial on the subjects which it hoped its insured would have testified about had it agreed to send a representative to the corporate representative deposition. This result is not a *sanction,* however, because the 30(b)(6) sanctions apply only if the corporation has collective corporate knowledge but refuses to produce and/or adequately prepare a representative. Instead, it is a natural *consequence* of QBE's inability to obtain knowledge from its insured on the relevant subjects listed in the 30(b)(6) notice.

It would be patently unfair to permit QBE to avoid providing a corporate deposition designee on certain topics (because its insured refuses to cooperate) yet allow it to take a position at trial on those very same issues by introducing testimony which Defendant Jorda was unable to learn about during a pre-trial 30(b)(6) deposition.

This Order will, in the analysis section, pinpoint the specific issues on which QBE will be precluded from offering trial testimony.

By way of a final introductory note, the Court will award some attorneys fees to Defendant Jorda in connection with its motion.

## II.    **Factual Background**

In late September 2004, QBE issued a commercial lines insurance policy to The Club at Brickell Bay Condominium Association, Inc., a not-for-profit Florida corporation, covering certain losses at a luxury high-rise condominium complex.  (ECF 1).  In late August, 2005, the insured sustained water damage to the property.  QBE now contends that the water damages were caused by a failed PVC pipe installed by Defendant Jorda.

Pursuant to the insurance policy, QBE ultimately (after litigation) paid its insured approximately $3.029 million and then filed this two-count Complaint against Jorda for common law indemnity and equitable subrogation.  Jorda denies the claims and asserts myriad affirmative defenses.  (ECF 21).  Jorda contends that any negligence on its part must be apportioned and reduced by the insured's own negligence and the negligence of other contractors and subcontractors.  It also contends that QBE stands in the shoes of its insured, which voluntarily and intentionally destroyed material evidence, failed to timely provide notice and failed to give Jorda notice and an opportunity to cure the alleged construction defects or other damages.

QBE filed its lawsuit in April 2010.  (ECF 1). The water damages at issue in the lawsuit occurred in late August 2005.  On January 6, 2011, U.S. District Judge Alan S. Gold issued a trial scheduling Order (ECF 28), setting the trial for the calendar beginning December 19, 2011 and establishing a July 29, 2011 deadline for all non-expert discovery.  On May 20, 2011 (ECF 41), Judge Gold issued an Order granting the parties' joint motion to extend the pretrial and trial dates.  In this Order, Judge Gold scheduled the trial for the calendar period beginning June 4,

2012 and extended the non-expert discovery deadline to **December 30, 2011** – the deadline the parties themselves suggested.

On October 17, 2011, Jorda issued its Re-Notice of Taking Deposition Pursuant to Fed. R. Civ. Pro. 30(b)(6), designating 47 topics on which a QBE designee would provide testimony to bind QBE.  Thirty-five of the 47 topics concerned electronically stored information (ESI), sometimes termed, albeit informally, email discovery.

QBE did not object to any of the 12 non-ESI topics.  It did not contend that the topics were beyond the scope of discovery, it did not object to the wording of the listed topics and it did not suggest that the descriptions were vague or in any way unworkable. Although it *threatened* Jorda with a stated intent to file a motion for a protective order concerning the 35 ESI topics, it never did so (and it never filed a motion for protective order as to any of the other topics).  At a later hearing, Jorda explained that QBE issued a similar discovery request, designating virtually the same ESI topics in its reciprocal 30(b)(6) deposition notice.  Jorda suggests that QBE backed down from its threat to file a motion for protective order because QBE sought the identical discovery.  Whatever the reason for its decision not to pursue the informally threatened motion for protective order, the important fact for present purposes is that QBE never sought a protective order or any other, similar relief from the Court regarding Jorda's Rule 30(b)(6) deposition notice.

After some squabbling about deposition scheduling, the parties ultimately agreed to a November 14, 2011 30(b)(6) deposition date.  QBE provided only one designee for the 47 topics noticed for the corporate representative deposition: Timothy O'Brien, the senior claims representative for Florida Intracoastal Underwriters, QBE's managing general agent in Florida. FIU is an independent company, not an affiliate or subsidiary of QBE.

Shortly *after* the deposition began, Jorda learned for the first time that Mr. O'Brien would not be QBE's representative for many of the 47 topics (and would not be the designee for any of the 35 topics concerning ESI).

Although during the deposition QBE and Mr. O'Brien collectively advised Jorda that Mr. O'Brien was not the appropriate corporate designee for several of the first twelve non-ESI topics, Mr. O'Brien actually did provide testimony on some of the issues for which he was not designated as "the person with the most knowledge."[1]   But Mr. O'Brien testified for approximately 6 hours at the corporate representative deposition and failed to provide competent testimony on several other topics.   Jorda now contends it is prejudiced by QBE's failure to provide an adequate designee with knowledge of all topics.  The specific topics which were not addressed by QBE's sole corporate representative and the particular prejudice alleged by Jorda will be discussed with specificity below, in the section detailing the results of the 30(b)(6) deposition.

QBE's counsel promised to designate another 30(b)(6) witness but never did so.   On November 22, 2011, QBE's counsel instructed Jorda to notice the continuation of the 30(b)(6) deposition and agreed to produce an appropriate (albeit not yet identified) designee.    In particular, QBE advised that it is "still waiting on a name" but directed Jorda to notice the rescheduled 30(b)(6) deposition and advised "we will produce a witness."

Relying upon this commitment, Jorda issued another 30(b)(6) deposition notice, scheduling the continuation of the deposition for Monday, December 12, 2011.  On the Friday before the scheduled Monday deposition, an attorney representing QBE's insured advised that

---

[1]     Counsel often invoked the "person most knowledgeable" phrase during the 30(b)(6) corporate deposition, but the rule contains no such phrase.  More on this later, in the section entitled "The Law Concerning 30(b)(6) Depositions."

his client would *not* be providing a witness for the deposition.   As a result, QBE's counsel appeared at the December 12, 2011 deposition, but no corporate designee appeared.

Jorda filed its sanctions motion on December 21, 2011 (ECF 70).   In its opposition (ECF 75), QBE attached copies of emails between its counsel and counsel for the insured condominium association and between its counsel and Jorda's counsel.   The first email it attached reflecting communications with the insured's counsel is dated November 23, 2011.   On November 23, 2001, the insured's counsel advised QBE that he was "still trying to get a name from the client" and that "I do not have response from the client."   A week later, on November 30, 2011, QBE's counsel sent an email to Jorda's counsel, advising that it was still "awaiting a name" but noting that "the corporate representative will be a current Board member."   On the same date, QBE's counsel also wrote to the insured's counsel, asking if he was "able to secure an individual so we can provide counsel a name?"

The next day, on December 1, 2011, frustrated by the insured's failure to disclose a name for a 30(b)(6) witness, QBE wrote to the insured's counsel, saying, "If we fail to receive a name from Club by tomorrow, Jorda and/or QBE will have **no choice but to bring action against Club** as a result of the violation and seek Court intervention to compel Club's cooperation." (emphasis added) (ECF 75-1).

On December 6, 2011, Jorda's counsel wrote to QBE's counsel, attaching the re-notice of taking 30(b)(6) deposition and making the following request: "if there is some problem between QBE and its insured in producing a qualified witness, let me know before I spend the money on the plane ticket."

After receiving the re-notice, QBE's counsel forwarded it (almost immediately) to its insured's counsel, asking him to confirm that the December 12, 2011 deposition was going forward with a condominium association witness who QBE would use as its designee.

Instead of confirming that the insured would produce an appropriate representative (whether it be a current board member or someone else), the insured's counsel provided a succinct, one-sentence response: "The insured has not agreed to attend any deposition."  He did not, however, provide a written response to QBE's litigation threat (made five days earlier).  The insured's counsel also sent a copy of the "we're-not-appearing-at-the-30(b)(6)-deposition" email to Jorda's counsel, who then advised that QBE's counsel had previously advised to the contrary and noted that he would "leave it to you and them to work out any differences between you."

A few minutes after this exchange, QBE's counsel wrote to Jorda's counsel, suggesting that a subpoena might help and asking Jorda whether it or QBE should issue the subpoena to the condominium association.  In response, Jorda contended that it is not required to subpoena a QBE 30(b)(6) witness and noted that the rule requires the designee to consent to testify on QBE's behalf.

On December 9, 2011, Jorda requested confirmation about the continued 30(b)(6) deposition scheduled for December 12, 2011, but QBE did not respond.  Jorda attended the 30(b)(6) deposition, but, as noted above, neither QBE nor its insured arranged for a designee to appear.  Likewise, neither QBE nor its insured arranged for a corporate designee to appear for the continued 30(b)(6) deposition before the December 30, 2011 discovery cutoff.

At the hearing, in response to questions from the Court, QBE advised that its insured has a contractual duty to cooperate with QBE but that QBE did not file the threatened lawsuit or take any other enforcement action after its insured announced (in the December 6, 2011 email from

its counsel) that it would not be providing a witness for the continued 30(b)(6) deposition.  QBE also advised that its insured's counsel candidly acknowledged that he was himself having difficulty communicating with his condominium association client.

### III.    The Parties' Contentions

Jorda has little sympathy for QBE's inability to procure an adequate 30(b)(6) witness on the designated topics and seeks sanctions.[2]

First, notwithstanding QBE's failure to arrange for a representative of its insured to appear as QBE's designee for many of the issues of the 30(b)(6) list, Jorda argues that QBE inadequately prepared its *own* designee Mr. O'Brien on topics which Mr. O'Brien should have been able to testify about had he been sufficiently prepared.  And Jorda faults QBE for taking several months to arrange for this deposition in the first place.  It also criticizes QBE for not

---

[2]    Depending on the nature of the sanction actually imposed, a United States Magistrate Judge has authority to enter a sanctions order (as opposed to a report and recommendation).  *Gomez v. Martin Marietta Corp.,* 50 F.3d 33 1511, 1519-20 (10th Cir. 1995) (rejecting argument that magistrate judge ruled on dispositive motion because litigant sought entry of a default judgment and explaining that "[e]ven though a movant requests a sanction that would be dispositive, if the magistrate judge does not impose a dispositive sanction," then the order is treated as not dispositive under Rule 72(a)); Wright, Miller & Marcus, Federal Practice and Procedure: Civil 2d § 3068.2, at 342-44 (West 1997).

A recent case illustrates a magistrate judge's ability to enter a significant discovery sanction order when the effect is not similar to a default judgment or to preclude a defense.  In *Moore v. Napolitano*, 723 F. Supp. 2d 167 (D.D.C. 2010), the district judge affirmed a magistrate's discovery sanctions order.  In doing so, the district court rejected the argument that the magistrate judge entered a "severe sanction akin to a litigation-ending default judgment" and affirmed the magistrate judge's order precluding the defendant from offering any legitimate, nondiscriminatory reason to rebut any prima facie case of disparate treatment discriminatory non-promotion of the individually named plaintiffs in an employment discrimination case.  *See also Carmona v. Wright*, 233 F.R.D. 270, 276  (N.D.N.Y. 2006) (magistrate judges permitted to enter sanctions orders for discovery violations because they are "generally non-dispositive matters" unless the order imposes a sanction which "disposes of a claim; e.g., striking pleadings with prejudice or dismissal"); *Exxon Corp. v. Halcon Shipping Co. Ltd.,* 156 F.R.D. 589 (D.N.J. 1994) (magistrate judge's order precluding expert witness from testifying as a sanction for violation of a pretrial discovery order was reviewed under the clearly erroneous or contrary to law standard of review); *San Shiah Enter. Co., Ltd. v. Pride Shipping Corp.,* 783 F. Supp. 1334 (S.D. Ala. 1992) (magistrate judge authorized to impose Rule 11 sanctions).

advising it of Mr. O'Brien's now-acknowledged limitations -- i.e., he was not produced to provide testimony on many of the subjects listed – until *after* the deposition began.  Jorda further condemns QBE for not ensuring that Mr. O'Brien reviewed the significant amounts of available written material, thereby aggravating his lack of preparation.

Second, concerning the subjects for which QBE expected a condominium association board member to appear as its designee, Jorda blasts QBE for doing too little, too late.  Jorda argues that QBE waited until the eleventh hour before taking affirmative steps to secure a representative from its insured.  It also contends that QBE knew it might be difficult to procure an association witness several months earlier, when it confronted a similar "but-our-insured-has-the-information" scenario when responding to written discovery requests.  According to Jorda, QBE should have timely confronted what it deems an obvious issue.  Had QBE done so, Jorda argues, QBE would have had time to respond to its insured's intransigence and take the necessary steps to compel its cooperation or make other arrangements.  In addition, Jorda notes that QBE did even not follow through on its belated threat to pursue a claim against its insured after the insured refused to comply with its contractual obligation to cooperate with QBE in pursuing this subrogation claim.

Notwithstanding its ultimate inability to produce an association witness capable of testifying as to all the listed 30(b)(6) topics, QBE rejects the notion that sanctions are warranted. It notes that Mr. O'Brien testified for six hours, which means that Jorda would have had only one additional hour in which to ask questions about the other remaining issues.[3]  QBE contends that

---

[3]    Fed. R. Civ. Pro. 30(d)(1)  limits a deposition to one day of 7 hours, unless otherwise stipulated to the by the parties or ordered by the Court. The parties here have not advised the Court of any agreement to take depositions of more than seven hours, have not asked the Court to enter an order allowing a longer deposition, and the Court has not entered such an order.  To the contrary, QBE argued at the hearing that this 7-hour limit is still binding and suggests that this time limit militates against Jorda's motion.

it and its designee acted in good faith and that Mr. O'Brien did the best job he could under the circumstances. QBE rejects the idea that Mr. O'Brien should have reviewed hundreds or thousands of pages of transcripts and other materials and contends that his review of summaries provided by others is sufficient preparation. QBE also takes issue with the alleged scope of Mr. O'Brien's alleged inability to provide testimony to bind the corporation and suggests that Jorda has exaggerated his deficiencies, taken certain statements out of context and/or otherwise provided a slanted and unfair view of his deposition.

[Given this discrepancy over Mr. O'Brien's adequacy as a 30(b)(6) witness, the Court asked Jorda to submit a list pinpointing his deficiencies and explaining why this prejudiced Jorda and how it would undermine its trial preparation. Jorda filed the list (ECF 97). The Court also gave QBE the opportunity to respond to this list, which it did (ECF 100)].

For many of the topics, QBE contends (ECF 100) that it "never possessed" certain records because it is "only the insurer." Therefore, according to QBE, "the knowledge and documents belonged to a non-party [i.e., the insured condominium association] and QBE had no obligation under 30(b)(6) to gain knowledge it would have never had to begin with."

Concerning the 35 topics of electronically stored information listed in the 30(b)(6) notice, QBE takes the position (ECF 100-1) that "Defendant abandoned the discovery after QBE indicated its intent to file a Motion for Protective Order on the record at deposition and an explanation as why the requested information was relevant/discoverable and Defendant never provided said explanation or indicated it was pursuing this information."

In other words, QBE argues waiver for these 35 topics.

The Court has reviewed the entire transcript of Mr. O'Brien's six-hour deposition and finds that he was able to competently testify as QBE's corporate representative designee on *some*

11

of the 47 topics.  But Mr. O'Brien was completely unable to provide deposition answers to questions covering the 35 ESI-related topics (which QBE's counsel candidly acknowledged at the start of the deposition).  He was similarly unable to provide corporate designee testimony of several of the initial 12 non-ESI topics.

Although QBE does not believe that any *sanctions* are necessary to compensate for its designee's inability to provide testimony on many subjects, it basically **agrees** with the conclusion that the practical result of this inability is QBE cannot provide trial testimony on those subjects.  Specifically, **QBE's counsel provided the following concession at the hearing:**

> So as to the first 12 topics, you know, not only did he testify to the best that he could, he is the QBE guy.  And if he says, "I don't know," QBE is **bound with that answer**, and I don't think anybody would debate that, but when it comes to trying to get information that is solely within the possession of a third-party, and they are not consenting and we cannot subpoena them under the rule, we shouldn't be sanctioned and have testimony stricken that we couldn't even present anyway if we don't have evidence of it.

(ECF 93, p. 47) (emphasis added).

Likewise, QBE's counsel also noted that, "to the extent as to QBE, [he testified] "I don't know," and **that's QBE's answer**." (ECF 93, p. 48) (emphasis added).  QBE repeated the concession later in the hearing, as well, saying, "**If they don't have knowledge** of the categories that are listed within in the ones that I referenced the first 12 as it pertains to QBE, if they don't have the knowledge, **then there is not going to be evidence presented on it**."  (ECF 93, p. 98) (emphasis added).

Thus, QBE effectively agrees with the relief sought by Jorda concerning the categories its designee said he did not know about -- preclusion of trial testimony.  QBE's nuance, however, is that this remedy should not be designated as a *sanction.*

QBE also argues that it should not be sanctioned for its insured's refusal to cooperate because the knowledge is not known to it and it cannot be punished for another party's failure to comply with a contractual cooperation provision.  It also contends that it acted diligently and in good faith and points to its litigation threat against the association as evidence of its diligence.

In practical terms, QBE takes the position that it is in a Catch-22 situation[4] because its own employees and/or agents do not have the knowledge necessary to provide testimony on all the 30(b)(6) categories, the corporation does not have (and never did have) the information available to prepare a designee, the party which does have the information (i.e., its insured) refuses to cooperate but forcing cooperation through a subpoena or lawsuit would be problematic because the insured's representative would not be consenting to appear if compelled by a subpoena.

Similarly, QBE's argument is, in effect, that it is caught between "a rock and a hard place"[5]  QBE notes that it has no witness of its own to answer questions on some of the topics

---

[4]     A Catch-22 scenario is one involving "a problematic situation for which the only solution is denied by a circumstance inherent in the in the problem."  It is also defined as an "illogical, unreasonable or senseless situation."  http://www.merriam-webster.com/dictionary/catch-22 (last visited January 13, 2012).

The term "Catch-22" originates from a military regulation in a 1961 novel of the same name written by Joseph Heller.  Popularized after the 1970 movie of the same name, the "catch" is that a bomber pilot is insane if he flies combat missions without asking to be to be relieved from duty and is thus eligible to be relieved from duty.  But if he *asks* to be relieved from duty, that means he is sane and must keep flying combat missions. http://dictionary.reference.com/browse/catch-22 (last visited January 27, 2012).

[5]     To be caught between a rock and a hard place is a situation where you have to choose between two possible actions, both of which are dangerous, unpleasant or unacceptable. http://www.ldoceonline.com/dictionary/Scylla-and-Charybdis (last visited January 17, 2012).

For a musical reference to this type of unenviable scenario, *see* "Rock and a Hard Place," a 1989 song by the Rolling Stones, released on its "Steel Wheels" album.  The Rolling Stones recorded the album in Montserrat and London.  Written by Mick Jagger and Keith Richards, the song contains the chorus: "stuck between a rock and a hard place."

because this is a subrogation claim (where its insured, and not the insurance company, was involved in the underlying facts) and it cannot obtain the information and/or testimony from its insured even though the insured received more than $3 million

QBE argues that fundamental fairness principles militate against a sanctions award.

QBE suggested that Jorda could obtain the remaining 30(b)(6) testimony not provided by Mr. O'Brien by serving the condominium association with a 30(b)(6) subpoena, which would require the association, QBE's insured, to produce one or more appropriate representatives at a deposition.   But Jorda notes that *it* does not have the burden to serve subpoenas to obtain 30(b)(6) testimony from a party.   Moreover, Jorda notes that the rule requires the served party to designate one or more persons "who **consent**" to testify on behalf of the served corporation. Thus, a person produced by the condominium association in response to a separate 30(b)(6) subpoena would not fulfill *QBE's* 30(b)(6) obligation because the person would not be consenting to appear on behalf of QBE.   At the hearing, QBE suggested that this practical dilemma could be obviated by having QBE agree in advance to accept the testimony of the association's designee (or designees) as its own.

---

The phrase "to be caught between a rock and a hard place" is a reference to Odysseus' dilemma of passing between Scylia and Charybdis. Syclia was a monster on the cliffs and Charybdis was a monster whose actions personified a dangerous whirlpool.   Both were exceedingly difficult to overcome.   http:wwww.english-for-students.com/A-rock.html  (last visited January 17, 2012).   In particular, Scylla was a supernatural creature, with 12 feet and 6 heads on long, snaky necks.   Charybdis, who lurked under a fig tree on the opposite shore, drank down and belched forth the waters three times a day and was fatal to shipping. http://www.britannica.com/EBchecked/topic/530331/Scylla-and-Charybdis (last visited January 17, 2012).

The now-disbanded rock group "The Police" sang about these two mythological monsters in "Wrapped Around Your Finger," a song on the "Synchronicity" album, released in June 1983. Written by Sting, the song contains the following lyric: "You consider me the young apprentice, caught between the Scylia and Charybdis."   http:www.elyrics.net/read/p/police-lyrics/wrapped-around-your-finger-lyrics.html (last visited January 17, 2012).

But QBE has not served the association with a 30(b)(6) subpoena and, as noted, the discovery deadline has now expired.  Moreover, QBE did not explain what consequences would arise if the association failed to produce a designee or if the designee were unable to provide adequate testimony or if the association did not sufficiently prepare its designee.  In other words, the *association* might confront sanctions for *its* failure to fulfill its 30(b)(6) corporate deposition subpoena obligation, but how would that help Jorda prepare to defend at trial against a lawsuit filed by *QBE*?  In addition, QBE did not explain what would happen at trial if the association's designee provided illogical, outrageous, baseless or just plain odd testimony in a 30(b)(6) deposition.  Would QBE be bound by those answers or could it take a different position at trial?  How could Jorda effectively cross-examine an association designee at trial when the designee was appointed by the association, not by QBE?  There is also a practical concern that the jury might consider that testimony as being provided solely on the association's behalf and not attributable directly to QBE.

QBE did not provide or suggest answers to these types of practical issues, all of which could easily arise if QBE's creative suggestion were to be followed.  And it did not provide any authority approving or even discussing this novel approach to a party's obligation to provide 30(b)(6) testimony.

As if the situation were not already complicated enough, Jorda contends that QBE actually has *two* insureds -- the condominium association and the developer -- but QBE failed to ask the developer for documents, information and cooperation.  QBE concedes that it took no steps after it filed this lawsuit to contact the developer.  Nevertheless, it explained that it already had some of the developer's files in its possession from the prior litigation and as part of the standard turnover process (when the developer turns over control of the association from itself to

the condominium owners).  But this information only serves to muddy the water even further because, unlike the association, which the parties agree is under a contractual obligation to cooperate with QBE in this subrogation action, no party advised the Court that the developer is similarly obligated. What is certain, however, is that QBE did not attempt to arrange for a developer representative to be QBE's 30(b)(6) designee and that it is possible that the developer may have been able to produce a witness who could comment on certain of the Rule 30(b)(6) topics on QBE's behalf. It is also possible that the developer might have had additional documents – which either Mr. O'Brien or another QBE representative could have reviewed to bolster the preparation – which had not previously been turned over to the condominium association. But neither QBE nor Jorda can represent to the Court what documents or information the developer has (or could locate) because QBE did not attempt to pursue this potential source of information and testimony after it filed this subrogation lawsuit.

### IV.    The Law Concerning 30(b)(6) Depositions

Fed. R. Civ. Pro. 30(b)(6) ["Notice or Subpoena Directed to an Organization"] provides, in pertinent part:

> In its notice or subpoena, a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination. The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; . . . The persons designated must testify about information **known or reasonably available to the organization.**

(emphasis added).

If the case law outlining the guiding principles of 30(b)(6) depositions could be summarized into a *de facto* Bible governing corporate depositions, then the litigation

commandments and fundamental passages about pre-trial discovery would likely contain the following advice:

1.      The rule's purpose is to streamline the discovery process.  In particular, the rule serves a unique function in allowing a specialized form of deposition.  *Great Am. Ins. Co. v. Vegas Constr. Co., Inc.,* 251 F.R.D. 534, 539 (D. Nev. 2008)

2.      The rule gives the corporation being deposed more control by allowing it to designate and prepare a witness to testify on the corporation's behalf.  *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D. N.C. 1996).

3.      It is a discovery device designed to avoid the bandying by corporations where individual officers or employees disclaim knowledge of facts clearly known to the corporation. *Great Am.*, 251 F.R.D. at 539; *Taylor*, 166 F.R.D. at 361.

4.      Therefore, one purpose is to curb any temptation by the corporation to shunt a discovering party from "pillar to post" by presenting deponents who each disclaim knowledge of facts known to someone in the corporation. *Great Am.*, 251 F.R.D. at 539.  *Cf. Ierardi v. Lorillard, Inc.*, No. 90–7049, 1991 WL 66799, *2 (E.D. Pa. Apr. 15, 1991), at *2 (without the rule, a corporation could "hide behind the alleged 'failed' memories of its employees").

5.      Rule 30(b)(6) imposes burdens on both the discovering party and the designating party.  The party seeking discovery must describe the matters with reasonable particularity and the responding corporation or entity must produce one or more witnesses who can testify about the corporation's knowledge of the noticed topics.  *Great Am.,* 251 F.R.D. at 539.

6.      The testimony of a Rule 30(b)(6) witness represents the collective knowledge of the corporation, not of the specific individual deponents.  A Rule 30(b)(6) designee presents the

corporation's position on the listed topics.   The corporation appears vicariously through its designees.  *Taylor*, 166 F.R.D. at 361.

7.      A corporation has an affirmative duty to provide a witness who is able to provide binding answers on behalf of the corporation.  *Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.,* 497 F.3d 1135, 1147 (10th Cir. 2007).

8.      Thus, a Rule 30(b)(6) witness need not have personal knowledge of the designated subject matter.  *Ecclesiastes,* 497 F.3d at 1147; *see generally* <u>Federal Civil Rules Handbook</u>, 2012 Ed., at p. 838 ("the individual will often testify to matters outside the individual's personal knowledge").

9.      The designating party has a duty to designate more than one deponent if necessary to respond to questions on all relevant areas of inquiry listed in the notice or subpoena. *Ecclesiastes*, 497 F.3d at 1147; *Marker v. Union Fidelity Life Ins. Co.*, 125 F.R.D. 121, 127 (M.D. N.C. 1989) (duty to substitute another witness as a designee once the initial designee's deficiencies become apparent during the deposition); *Alexander v. F.B.I.*, 186 F.R.D. 137, 142 (D.D.C. 1998).

10.     The rule does not expressly or implicitly require the corporation or entity to produce the "person most knowledgeable" for the corporate deposition.   Nevertheless, many lawyers issue notices and subpoenas which purport to require the producing party to provide "the most knowledgeable" witness.   Not only does the rule not provide for this type of discovery demand, but the request is also fundamentally inconsistent with the purpose and dynamics of the rule.   As noted, the witness/designee need not have **any** personal knowledge, so the "*most* knowledgeable*" designation is illogical.  *PPM Fin., Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 894-95 (7th Cir. 2004) (rejecting argument that trial court should not have credited the testimony

of a witness who lacked personal knowledge because the witness was a 30(b)(6) witness and "was free to testify to matters outside his personal knowledge as long as they were within the corporate rubric").  Moreover, a corporation may have good grounds not to produce the "most knowledgeable" witness for a 30(b)(6) deposition. For example, that witness might be comparatively inarticulate, he might have a criminal conviction, she might be out of town for an extended trip, he might not be photogenic (for a videotaped deposition), she might prefer to avoid the entire process or the corporation might want to save the witness for trial.  From a practical perspective, it might be difficult to determine which witness is the "most" knowledgeable on any given topic.  And permitting a requesting party to insist on the production of the most knowledgeable witness could lead to time-wasting disputes over the comparative level of the witness' knowledge. For example, if the rule authorized a demand for the most knowledgeable witness, then the requesting party could presumably obtain sanctions if the witness produced had the *second* most amount of knowledge.  This result is impractical, inefficient and problematic, but it would be required by a procedure authorizing a demand for the "most" knowledgeable witness.  But the rule says no such thing.

11.    Although the rule is not designed to be a memory contest, the corporation has a duty to make a good faith, conscientious effort to designate appropriate persons and to prepare them to testify fully and non-evasively about the subjects.  *Great Am.*, 251 F.R.D. at 540.

12.    The duty to prepare a Rule 30(b)(6) witness goes beyond matters personally known to the designee or to matters in which the designated witness was personally involved. *Wilson v. Lakner*, 228 F.R.D. 524 (D. Md. 2005).

13.     The duty extends to matters reasonably known to the responding party. *Fowler v. State Farm Mut. Auto. Ins. Co.*, No. 07-00071 SPK-KSC, 2008 WL 4907865, at *4 (D. Haw. 2008).

14.     The mere fact that an organization no longer employs a person with knowledge on the specified topics does not relieve the organization of the duty to prepare and produce an appropriate designee.  *Id.; Great Am.*, 251 F.R.D. at 540; *Taylor*, 166 F.R.D. at 362; *cf. Ecclesiastes*, 497 F.3d at 1148 (in "one common scenario," the corporation designates individuals who lack personal knowledge "but who have been **educated about it**") (emphasis added).

15.     Faced with such a scenario, a corporation with no current knowledgeable employees must prepare its designees by having them review available materials, such as fact witness deposition testimony, exhibits to depositions, documents produced in discovery, materials in former employees' files and, if necessary, interviews of former employees or others with knowledge.  *Great Am.*, 251 F.R.D. at 540; Federal Civil Rules Handbook, p. 838;  *see generally Wilson*, 228 F.R.D. at 529 (preparation required from myriad sources, including "documents, present or past employees, or other sources").

16.     In other words, a corporation is expected to *create* an appropriate witness or witnesses from information reasonably available to it if necessary.  *Wilson*, 228 F.R.D. at 529.

17.     As a corollary to the corporation's duty to designate and prepare a witness, it must perform a reasonable inquiry for information that is reasonably available to it.  *Fowler*, 2008 WL 4907865 at *5; *Marker*, 125 F.R.D. at 127.

18.     A corporate designee must provide responsive answers even if the information was transmitted through the corporation's lawyers. *Great Am.*, 251 F.R.D. at 542.

19.     In responding to a Rule 30(b)(6) notice or subpoena, a corporation may not take the position that its documents state the company's position and that a corporate deposition is therefore unnecessary.  *Great Am.*, 251 F.R.D. at 540.

20.     Similarly, a corporation cannot point to interrogatory answers in lieu of producing a live, in-person corporate representative designee.  *Marker*, 125 F.R.D. at 127.

21.     Preparing a Rule 30(b)(6) designee may be an onerous and burdensome task, but this consequence is merely an obligation that flows from the privilege of using the corporate form to do business.  *Great Am.*, 251 F.R.D. at 541; *see also Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 38 (D. Mass. 2001) (review required even if "documents are voluminous and the review of those documents would be burdensome").

22.     Not only must the designee testify about facts within the corporation's collective knowledge, including the results of an investigation initiated for the purpose of complying with the 30(b)(6) notice, but the designee must also testify about the corporation's position, beliefs and opinions.  *Great Am.*, 251 F.R.D. at 539; *Taylor*, 166 F.R.D. at 362 (designee presents corporation's "position," its "subjective beliefs and opinions" and its "interpretation of documents and events").

23.     The rule implicitly requires the corporation to review all matters known or reasonable available to it in preparation for a Rule 30(b)(6) deposition.  *Wilson*, 228 F.R.D. at 529 ("good faith effort" to "find out the relevant facts" and to "collect information, review documents and interview employees with personal knowledge").

24.     If a corporation genuinely cannot provide an appropriate designee because it does not have the information, cannot reasonably obtain it from other sources and still lacks sufficient knowledge after reviewing all available information, then its obligations under the Rule cease.

*Calzaturficio*, 201 F.R.D. at 39;  *see also Dravo Corp. v. Liberty Mut. Ins. Co.*, 164 F.R.D. 70,

76 (D. Neb. 1995).

25.    If it becomes apparent during the deposition that the designee is unable to

adequately respond to relevant questions on listed subjects, then the responding corporation has a

duty to timely designate additional, supplemental witnesses as substitute deponents.  *Alexander*,

186 F.R.D. at 142; *Marker*, 125 F.R.D. at 127.

26.    The rule provides for a variety of sanctions for a party's failure to comply with its

Rule 30(b)(6) obligations, ranging from the imposition of costs to preclusion of testimony and

even entry of default.  *Reilly v. Natwest Mkts. Grp. Inc.,* 181 F.3d 253, 269 (2d Cir. 1999)

(affirming order precluding witness five witnesses from testifying at trial); *see also Taylor,* 166

F.R.D. at 363 ("panoply of sanctions"); *Great Am.*, 251 F.R.D. at 543 ("variety of sanctions").[6]

27.    The failure to properly designate a Rule 30(b)(6) witness can be deemed a

nonappearance justifying the imposition of sanctions.  *Resolution Trust Corp. v. Southern Union*

*Co., Inc.*, 985 F.2d 196, 198 (5th Cir. 1993)). *See also Black Horse Lane Assoc., L.P. v. Dow*

*Chem. Corp.*, 228 F.3d 275, 305 (3d Cir. 2000) (a 30(b)(6) witness who is unable to give useful

information is "no more present for the deposition than would be a deponent who physically

appears for the deposition but sleeps through it").

28.    When a corporation's designee legitimately lacks the ability to answer relevant

questions on listed topics and the corporation cannot better prepare that witness or obtain an

adequate substitute, then the "we-don't-know" response can be binding on the corporation and

prohibit it from offering evidence at trial on those points.  Phrased differently, the lack of

---

[6]    Requiring the responsive party to produce another 30(b)(6) deposition witness who is
prepared and educated is a frequently-invoked sanction which is not available now in this case
because the discovery cutoff has expired (and no one has filed a motion to extend the now-
expired discovery deadline, and the Undersigned would not in any event be able to unilaterally
change the deadlines imposed by U.S. District Judge Alan S. Gold).

knowledge answer is itself an answer which will bind the corporation at trial. *Fraser Yachts Fla., Inc. v. Milne*, No. 05-21168-CIV-JORDAN, 2007 WL 1113251, at *3 (S.D. Fla. Apr. 13, 2007); *Chick-Fil-A v. Exxonmobil Corp.*, No. 08-61422-CIV, 2009 WL 3763032, at *13 (S.D. Fla. Nov. 10, 2009); *see also Ierardi,* 1991 WL 66799 at *3 (if party's 30(b)(6) witness, because of lack of knowledge or failing memory, provides a "don't know" answer, then "that is itself an answer" and the corporation "will be bound by that answer").

29.     Similarly, a corporation which provides a 30(b)(6) designee who testifies that the corporation does not know the answers to the questions "will not be allowed effectively to change its answer by introducing evidence at trial." *Ierardi v. Lorillard*, No. 90–7049, 1991 WL 158911 (Aug. 13, 1991) (E.D. Pa. 1991, at *4).[7]

30.     The conclusion that the corporation is bound at trial by a legitimate lack of knowledge response at the 30(b)(6) deposition is, for all practical purposes a variation on the rule and philosophy against trial by ambush. *Calzaturficio*, 201 F.R.D. at 38; *Wilson*, 228 F.R.D. at 531; *Taylor*, 166 F.R.D. at 363 (rule prevents "sandbagging" and prevents corporation from making a "half-hearted inquiry before the deposition but a thorough and vigorous one before the trial").

31.     If the corporation pleads lack of memory after diligently conducting a good faith effort to obtain information reasonably available to it, then it still must present an opinion as to why the corporation believes the facts should be construed a certain way *if* it wishes to assert a position on that topic at trial. *Taylor,* 166 F.R.D. at 362.

32.     There is nothing in the rule which prohibits a corporation from adopting the testimony or position of another witness in the case, though that would still require a corporate

---

[7]     This Order cites <u>two</u> decisions from *Ierardi*: one from April 15, 1991 (1991 WL 66799) and one from August 13, 1991 (1991 WL 158911).

designee to formally provide testimony that the corporation's position is that of another witness. *Fraser Yachts*, 2007 WL 1113251, at *3.

33.     The rule does not expressly require the designee to personally review all information available to the corporation.  So long as the designee is prepared to provide binding answers under oath, then the corporation may prepare the designee in whatever way it deems appropriate – as long as *someone* acting for the corporation reviews the available documents and information.  *Reichold, Inc. v. U.S. Metals Ref. Co.*, No. 03-453 (DRD), 2007 WL 1428559, at *9 (D.N.J. May, 10, 2007) (the rule "does not require that the corporate designee personally conduct interviews," but, instead, requires him to testify to matters known or reasonably available to the corporation).

34.     Rule 30(b)(6) means what it says.  Corporations must act responsibly.  They are not permitted to simply declare themselves to be mere document-gatherers.  They must produce live witnesses who have been prepared to provide testimony to bind the entity and to explain the corporation's position. *Wilson*, 228 F.R.D. at 531; *Great Am.*, 251 F.R.D. at 542 (entitled to "corporation's position").

35.     Despite the potentially difficult burdens which sometimes are generated by Rule 30(b)(6) depositions, the corporation is not without some protection, as it may timely seek a protective order or other relief.  *C.F.T.C. v. Noble Metals Int'l, Inc.,* 67 F.3d 766, 772 (9th Cir. 1995).

36.     Absolute perfection is not required of a 30(b((6) witness.  The mere fact that a designee could not answer every question on a certain topic does not necessarily mean that the corporation failed to comply with its obligation.  *Costa v. City of Burlington,* 254 F.R.D. 187, 191 (D.N.J. 2008); *Chick-Fil-A*, 2009 WL 3763032, at *13 (explaining that the corporation need

not produce witnesses who know every single fact -- only those relevant and material to the incidents underlying the lawsuit.

37.     A corporation cannot be faulted for not interviewing individuals who refuse to speak with it. *Costa*, 254 F.R.D. at 192.

38.     There are certain cases, such as subrogation cases or those involving dated facts, where a corporation will not be able to locate an appropriate 30(b)(6) witness.  In those types of scenarios, the parties "should anticipate the unavailability of certain information" and "should expect that the inescapable and unstoppable forces of time have erased items from . . . memory which neither party can retrieve."  *Barron v. Caterpillar, Inc.*, 168 F.R.D. 175, 178 (E.D. Pa. 1996) (concluding that corporation did not act in bad faith when its designee did not remember events from almost thirty years earlier).

39.     A corporation which expects its designee to be unprepared to testify on any relevant, listed topic at the corporate representative deposition should advise the requesting party of the designee's limitations before the deposition begins. *Calzaturficio*, 201 F.R.D. at 39.

**V.     The 30(b)(6) deposition of Timothy O'Brien**

**a.     Continued Focus on His "Most Knowledgeable" Status**

QBE produced Timothy O'Brien as its 30(b)(6) corporate deposition designee.  Although the rule does not require a party to designate "the most knowledgeable" person as the representative it selects, does not require that the designee have any personal knowledge and does not limit the designee to the party's employees, counsel spent considerable time discussing whether Mr. O'Brien had the *most* knowledge on a certain topic and, if not, whether he knew the identity of the person who did have this often-discussed level of knowledge.[8]

---

[8]     Jorda's "re-notice of taking deposition pursuant to Fed. R. Civ. P. 30(b)(6)" purported to instruct QBE to "designate an individual or individuals with **personal knowledge**" to provide

Mr. O'Brien explained (ECF 69-1, Dep. Tr. 14) that he is the person with the most knowledge about the authority to act on QBE's behalf on the claim because he was the file handler, and the file is, and was always, under his control.  Jorda asked him if QBE designated him as the person with "personal knowledge" of the matters listed in the 30(b)(6) notice.  (ECF 69-1, Dep. Tr. 15-16).  Mr. O'Brien explained that he would be the QBE designee with the most knowledge for some matters, but not for others.

QBE's counsel then attempted to clarify Mr. O'Brien's role, explaining: "But when he's talking about being the person for QBE, he may be the person at QBE with the most knowledge of some of those areas.  But some of these areas, because we're in subrogation, it would have to be something from the club, so that's clear.  So he may – if you want him to say whether he's the person with the most knowledge at all, then he can clarify it that way."  (ECF 69-1, Dep. Tr. 16-17).

Mr. O'Brien then specified those topics for which he would be providing testimony to bind the corporation on a topic-by-topic basis.  At times, he discussed whether he was "the person."  At other times, he discussed whether he would be "the best" person to provide testimony.  For other topics, he explained if he had "the most knowledge."  And for other topics, he advised whether he was the "proper person" to testify for QBE or whether he "knows the most about what QBE knows" about a topic.  (ECF 69-1, Dep. Tr. 19-28).  For topics on which Mr. O'Brien said he was *not* the "proper" person or the "most knowledgeable" person, Jorda's counsel asked him (a non-QBE employee) to pinpoint who *would* be the proper person for QBE to designate.  (ECF 69-1, Dep. Tr. 19, 242-250).

_____

testimony on the listed topics. (emphasis added).  QBE did not object to the "personal knowledge" component of the re-notice, though it surely *could have* taken issue with the so-called requirement in Jorda's re-notice.

Jorda asked Mr. O'Brien whether he personally interviewed certain witnesses, such as members of the condominium associations's board of directors, association employees or members of the developer's board of directors.  (ECF 69-1, Dep. Tr. 25-28).

[The questions, answers and comments about the "most knowledgeable" witness miss the mark.  Jorda is not entitled to demand that QBE designate the *most* knowledgeable witness as its representative for the deposition.  QBE is not required to produce the most knowledgeable witness as its designee.  QBE's designee, Mr. O'Brien, does not determine who else QBE will or should designate for additional 30(b)(6) topics.  Jorda may in deposition *ask* Mr. O'Brien (or other designees) for the names of other witnesses he deems most knowledgeable on certain topics so that Jorda may serve deposition subpoenas on those individuals, but they would be *fact witnesses*, not 30(b)(6) designees who testify on behalf of QBE.  Moreover, it appears that Jorda asked Mr. O'Brien for his opinion on who would be most knowledgeable on designated topics for purposes other than learning the names of fact witnesses for possible non-30(b)(6) depositions].

At the end of six hours of deposition testimony, QBE's counsel advised that Mr. O'Brien "can only be the corporate rep. as to his role for FIU/QBE."  (ECF 69-1, Dep. Tr. 249).  This proclamation was incorrect, as Mr. O'Brien is not *necessarily* limited to providng 30(b)(6) testimony concerning his activities at FIU and his personal knowledge of QBE's activities.  For example, if the condominium association had agreed to cooperate and had been willing to have an officer spend 10 hours with Mr. O'Brien, reviewing associaiton documents and teaching him association policies, then Mr. O'Brien *could* have been QBE's 30(b)(6) designee for topics concerning the association and its document retention policies.

Defense counsel also advised at the end of the deposition that she "had an email (presumably from the association's attorney)" and, based on that, "we [QBE] are getting somebody from the Club that I received today, so we will give you that individual in the near future." (*Id.*)

### b. The Extent of Mr. O'Brien's Preparation (and QBE's Preparation of Him)

Mr. O'Brien spent seven or eight hours preparing for his 30(b)(6) deposition. Of that, three or hour hours were with QBE's counsel. He reviewed his file, the expert depositions, three examinations under oath and the summaries of the transcripts of tape-recorded statements taken by QBE's counsel. (ECF 69-1, Dep. Tr. 24-25, 85-86). Jorda notes that the summaries do not appear on QBE's privilege log, but has not moved to compel their production.

Mr. O'Brien did not personally interview any employees from the condominium associaiton or the developer entities. He did not review any association documents unless they were submitted as part of the claim in the underlying lawsuit, and he did not review any documents produced by the developer which were in QBE's possession. Mr. O'Brien did not review documents reflecting a lack of maintenance (by the condominium association and the developer) involving neglect of the heat pumps. (ECF 69-1, Dep. Tr. 103-14).

### c. Subjects on Which Mr. O'Brien Did Not Provide 30(b)(6) Deposition Testimony

Although Mr. O'Brien sometimes provided testimony about topics on which he initially said he would not be the corporate designee, there were some topics which he clearly and unequivocally designated as completely beyond his knowledge and/or preparation. Specifically, Mr. O'Brien testified that he could not provide informatin on any of the 35 e-discovery topics,

including matters involving the retention and destruction of documents at QBE, the condominium association and the developer. (ECF 69-1, Dep. Tr. 21, 242–246).

Before outlining, in summary fashion, the listed topics for which Mr. O'Brien could not provide 30(b)(6) corporate designee testimony, it is useful to flag the underlying factual theories surrounding the parties' positions:

QBE contends that Hurricane Katrina had nothing to do with the water damage to the condominim building. In particular, QBE takes the position that the hurricane in no way caused a water pipe to separate.

QBE's expert opined that the flood was caused by improper assembly of the water return pipe. QBE's expert opined that an inadequate amount of solvent cement was used on the return water piping connection. QBE also relies on the expert for its position that a fitting was not properly seated in the socket and the fitting was cut on a bias.

Jorda, on the other hand, suggests that the hurricane played a major role. Specifically, it notes that the door to the room containing the pipe was swinging open during the hurricane. In addition, Jorda contends that the condominium associaiton failed to turn off the water for many hours, thereby causing or aggravating water damage. Moreover, Jorda alleges that myriad other factors were responsible for the damage, including design flaws (in the cooling tower, pumping systems, electrical systems and the layout and drainage in the mechanical/electrical room), chronic failures to adequately maintain the property (including the heat pumps), misuse of equipment, improper installation of the pipe and failure to properly inspect the systems.

In connection with these theories, Jorda also takes issue with the apparent lack of maintenance records – a scenario which implicates its affirmative defense of evidence

destruction/spoliation.[9]   Jorda also contends that other contractors or subcontractors may have been negligent and that any alleged negligence by Jorda must be apportioned and reduced by this third party negligence.

Given that QBE already paid more than $3 million to the insured and given that Mr. O'Brien conceded that other parties could conceivably be potentially responsible for the damages, Jorda seeks information on how QBE came up with $3.02 million total payment to the insured, whether QBE apportioned responsibility for the damages and, if so, the apportionment calcuations it used.

Mr. O'Brien testified that QBE's position is that Jorda did not use a sufficient amount of glue on the pipe, did not properly install the pipe, failed to maintain the plumbing system and failed to take reasonable measures to avoid foreseeable damages.

 Concerning topics 1, 5 and 7 (maintenance personnel responsible for the air conditioning system at the property after it was installed, procedures for inspecting and repairing the system, including procedures for emergencies, other factors which may have caused the flood and operation of the cooling tower, pumping systems and electrical systems and the possible loss of electrical power on the day in question and Jorda's purported responsibility for the damage), Mr. O'Brien could **not** provide 30(b)(6) testimony on the following issues:

- Any maintenance agreement obligating Jorda to maintain the air conditioning.

- The procedures for emergencies, natural disasters, hurricanes, pipe bursts and valving off.

- Incidents involving the air conditioning system.

---

[9]     Jorda's fifteenth affirmative defense alleges that the condominium association and the developer, which assigned its rights to QBE, intentionally destroyed material evidence. According to Jorda, QBE is estopped from asserting subrogation claims.  (ECF 21).

- The operation of the cooling tower, pumping systems and electrical systems.

- The loss of electrical power on or about August 26, 2005 (i.e., the date of the damage and of Hurricane Katrina).

- How QBE apportioned responsibility for the damages.

- Jorda's affirmative defenses of the negligence of others.

Concerning topic 3 (persons who were responsible for observing or handling the HVAC pipe which separated or caused the flooding, the chain of custody surrounding the pipe and preservation of documents and other physical evidence), Mr. O'Brien testified that he was not the one to give testimony about retention and destruction of documents at the condominium association or the developer. (ECF 69-1, Dep. Tr. 244). He conceded that he did not ask anyone about these topics before the deposition.

Concerning topics 4 and 6 (documents regarding the claim and investigation of the original claim -- by the association – and the settlement terms, how an agreement was reached and payments made by QBE, including backup documentation, all uses of QBE funds and reasons for non-payments), Mr. O'Brien was **unable** to provide 30(b)(6) testimony on the following:

- QBE's involvement in the settlement of the underlying state court action.

- How QBE arrived at the $3.02 million figure it paid to the insured.[10]

For topic 8 (concerning the change in construction from an apartment to a condominium and notice of the change to Jorda and other subcontractors), Mr. O'Brien was unable to provide corporate designee testimony on any issue concerning the topic. He testified that he had no

---

[10]    Mr. O'Brien testified that Sanford Siegel, QBE's adjuster, would have that information, but Mr. Siegel advised Jorda, in his deposition, that he does *not* have that information.

knowledge of the area and had not spoken about it with anyone before the corporate designee deposition began.

Finally, for the 35 topics concerning electronic discovery, Mr. O'Brien could not provide any testimony about that subject and did not know who at QBE would be in a position to provide corporate designee testimony. (ECF 69-1, Dep. Tr. 245-246).

### d.  QBE's Stated Intent to Obtain a Witness From the Association

As the deposition unfolded and Mr. O'Brien's inability to provide adequate corporate designee testimony on all the listed topics became more apparent, QBE again explained that it had been trying to obtain the name of a condominium association witness from the association's attorney.  "I've always intended to produce somebody separate," defense counsel noted.  (ECF 69-1, Dep. Tr. 189).  QBE also repeated its position that Mr. O'Brien could "only say what QBE knows" because its role is "limited"  Nevertheless, she promised that "you're going to get somebody else for the association."

QBE did not say that it would obtain another witness from the developer.

QBE was unable to predict when it would obtain the witness (or witnesses) from the association.  "If I knew, I would be telling you," counsel explained. "Are we making every effort to get that person's name?  Yes.  I can only do what – I can't go in there with, you know – but our intent is to have someone separate for that, and we will get someone for that." (ECF 69-1, Dep. Tr. 190).

But, as noted above, QBE was not able to obtain any witnesses from the association to provide deposition testimony in a continued 30(b)(6) deposition, notwithstanding a letter threating a lawsuit.

**e.   Jorda's Claim of Prejudice From the Lack of 30(b)(6) Testimony**

Regardless of whether the omission was caused by Mr. O'Brien's lack of knowledge, QBE's failure to adequately prepare him, QBE's lack of collective corporate knowledge (and whether that gap could be filled through preparation and review of documents and other materials) or its inability to obtain testimony from its insured, Jorda contends that it is prejudiced by QBE's failure to provide testimony on the topics listed above.  Jorda asserts many types of purported prejudice, but the most-relevant theories are:

1.  It cannot provide its own experts with documents or testimony needed to demonstrate that the lack of maintenance or the failure to follow proper shut down procedures caused or contributed to the pipe separation and the resulting $3.02 million in damages.

2.  QBE has not provided the means for Jorda to obtain discovery on contributing causes and the negligence of others.

3.  Jorda has been prevented from obtaining discovery about the identity of material witnesses.

4.  QBE has prevented Jorda from obtaining discovery about a failure to mitigate damages.

5.  Jorda has not been provided testimony about how QBE apportioned the damages and whether it took into consideration the negligence of others.[11]

---

[11]    At the hearing on the motion for sanctions, QBE's counsel announced that the amount of money it decided to pay its insured was a "negotiated settlement" and that "there may not be a precise apportionment."  (ECF 93, p. 71).  By way of general summary, QBE's counsel noted that "ultimately it [i.e., the amount QBE decided to pay] was a business decision to settle the claim, and they just paid an amount."  Therefore, in response to Jorda's request for documents detailing the settlement breakdown, QBE's counsel explained that "there is no such list that is going to say how this 2.7 million or $3,000,000 that was paid is itemized.  It is not an itemized amount." (ECF 93, pp. 72-73).

6.  Jorda was unable to obtain from QBE testimony about the loss of electrical power and shutdowns which resulted in the surges and pressure and water temperature changes which Jorda's expert believes was the actual cause of the flood damage.

7.  Jorda's ability to pursue its spoliation affirmative defense, including the non-production of electronically stored information (ESI). Has been undermined or compromised.[12]

## VI.   Analysis

Before assessing the record evidence against the applicable law concerning 30(b)(6) issues, the Court will first address two arguments asserted by QBE which are simply incorrect.

First, QBE argues that Jorda abandoned the 35 ESI[13] categories after QBE "indicated its intent" to file a motion for a protective order by failing to explain why the information was relevant and by never "indicat[ing] it was pursuing this information." (ECF 100-1, p.8). QBE's position is incorrect for several reasons:

QBE never filed the motion for protective order.  In addition, QBE does not dispute the responsive argument that Jorda, in effect, called QBE's bluff by pointing out that QBE requested similar ESI information from Jorda. QBE never raised the purported objection to the 35 ESI topics with the Court after Jorda advised it to, in effect,  pull the trigger and file the motion if it

---

[12]   Jorda has submitted a list identifying documents which QBE never produced or never explained or identified as having been destroyed.  (ECF 97-1).  Jorda lists 15 categories of documents on the list, including tapes from the security cameras at the insured's condominium during and after Hurricane Katrina, the daily maintenance logs for the air conditioning system, work orders for the air conditioning system, the emergency or hurricane procedures, the water shut off procedures and the manuals for the air conditioning system.

[13]   Although the parties typically refer to the 35 topics as subjects relating to electronically stored information (ESI), the first of the 35 topics does not expressly concern ESI,  and it actually covers traditional, paper-type documents. Specifically, topic 1 is: "the person at [condominium association] who is the most knowledgeable about the retention and destruction of documents of [the condominium association]."

deemed it to be meritorious. Not only did Jorda not waive the subjects at the 30(b)(6) deposition of Mr. O'Brien, but it affirmatively asked questions about document retention and ESI. (Dep. Tr., p. 246). Moreover, QBE did not object to the question and Mr. O'Brien **answered the question** (albeit by saying he was not the "most knowledgeable" on those 35 topics and did not know who would be the most knowledgeable witness." (Dep. Tr., pp. 245-246).

Thus, Jorda did not abandon its efforts to obtain 30(b)(6) testimony on these 35 topics. These topics are relevant and discoverable, especially given Jordan's affirmative defense advocating a spoliation theory. *Marker*, 125 F.R.D. at 126 (party sought 30(b)(6) witness on "general file keeping, storage and retrieval systems").

Second, QBE is likewise incorrect when it repeatedly argues, in a post-hearing, topic-by-chart (ECF 100-1), that it had no 30(b)(6) obligation to obtain knowledge from non-parties to the litigation. As succinctly explained by the Tenth Circuit Court of Appeals in *Ecclesiastes*, the "contention that [a party] operated under a good-faith belief that it could decline to make Rule 30(b)(6) designations because it lacked control of potential designees strains credulity." 497 F.3d at 1147. The Court noted that a party's duty is "not negated by a corporation's alleged lack of control over potential Rule 30(b)(6) deponents" because a party is required to produce a knowledgeable deponent, regardless of whether the designee is a party's officer or employee or a "third-party" who has been "woodshedded" and "educated" by the responsive party." *Id.* at n.13.

Therefore, QBE was obligated to seek out information and documents from available third party sources – including its insured, the condominium association. The duty was particualry applicable here, where the association was contractually obligated to cooperate with QBE as part of a settlement agreement. Simply stated, the rule imposes a duty to provide testimony on matters known or "reasonable available" to the corporation. Just like a corporation

would be required to review documents in possession of its accountant[14] in order to comply with its 30(b)(6) duty, QBE was similarly obligated to review information available to it from the association and the developer.

As it turned out, of course, QBE *did* seek information and testimony from its insured but, through no apparent fault of QBE, its insured refused to cooperate. Therefore, QBE is incorrect on the law (it *did* have the duty to at least seek information available from the association) but the mistake is not legally significant on the sanctions front because it pursued the testimony and information notwithstanding its current stated legal position that it had no obligation to do so in the first place.

Because QBE is pursuing a subrogation claim based on rights which its insured assigned to it, QBE was confronted with some discovery requests for which it lacks knowledge and for which it cannot obtain necessary information to review.

Assuming that QBE timely pursued efforts to obtain information and testimony from its insured, the condominium association, and further assuming that it diligently exhausted those efforts, it cannot be "sanctioned" under a discovery misconduct theory for failure to provide adequate 30(b)(6) testimony on topics which its insured (but not QBE) has information. Rule 30(b)(6) requires a corporation or entity to produce a designee who will provide testimony about information "known or reasonably available" to the corporation.

Thus, if QBE does not know certain information because it is pursuing a subrogation claim (and does not always have witnesses who were factually involved at the time and who do not have all the documents generated at the time) and cannot obtain the information (because its insured has refused to cooperate even though it is contractually obligated to do so and was

---

[14]     *Calzaturficio,* 201 F.R.D. at 40.

threatened with litigation for failing to comply), then QBE's 30(b)(6) obligation has been extinguished.

On the other hand, if QBE failed to adequately prepare its own designee (i.e., Mr. O'Brien) by failing to review available documents or not interviewing available witnesses or not spending sufficient time itself or not causing Mr. O'Brien to devote more time to the project, then its 30(b)(6) obligation would not be extinguished. Likewise, if it failed to designate other available witnesses to supplement Mr. O'Brien's limited 30(b)(6) testimony, then its obligation would not be satisfied either. And if QBE waited until the eleventh hour to seek cooperation from its insured or failed to seek information, documents and cooperation from its other insured (the developer) or failed to explore other remedies (e.g., serving its insured with a formal demand letter or informally and consistently negotiating with the association's counsel) concerning the association, then its obligation would similarly remain open.

QBE could have selected any appropriate designee. It could have arranged for Mr. O'Brien to spend more than seven or eight hours preparing for deposition as the sole corporate designee on a 47-topic notice. It could have caused Mr. O'Brien to review additional documents. It could have arranged for others to review all available documents and then educated Mr. O'Brien on the findings. It could have designated additional witnesses besides Mr. O'Brien to be QBE's designee. It could have chosen someone other than Mr. O'Brien to be the sole designee. What it could *not* do, however, was produce Mr. O'Brien as its only designee, wait until the deposition started before providing notice that Mr. O'Brien would not be the corporate designee for many unobjected-to topics and then permit Mr. O'Brien to be the only designee without reviewing other material (which would have enabled him to provide testimony on QBE's behalf).

Because of the way the O'Brien deposition unfolded, it is difficult to pinpoint with particularity those precise subjects on which Mr. O'Brien had absolutely no information, those where he had incomplete information and those where he knew he was the designee but failed to review certain records.   At times, Mr. O'Brien announced that he would not be providng testimony on certain listed topics but then his testimony later actually covered some of those very same topics. It is also difficult to flag with precision those topics where Mr. O'Brien knew of other potential witnesses who he reasonably believed could be used as a supplemental 30(b)(6) witness, as opposed to those topics where he simply tossed out a possible name as a helpful guess.

Despite this somewhat hazy record, there are some points on which there is no dispute:

a.   QBE never produced another 30(b)(6) witness other than Mr. O'Brien.

b.   QBE never produced any witnesses from the condominium association as 30(b)(6) designees, to supplement Mr. O'Brien's admittedly incomplete corporate representative deposition.

c.   QBE never produced any witnesses from the developer as 30(b)(6) designees to follow through on the gaps left by Mr. O'Brien.

d.   The discovery cutoff expired on December 30, 2011.

e.   QBE argues against "sanctions" but its counsel **conceded at the hearing that it would not be able to take a different position at trial if Mr. O'Brien said he lacked sufficient information upon which to provide testimony about QBE's "position" on certain topics**.

Because the ultimate relief is the same regardless of whether QBE itself failed to comply with its 30(b)(6) obligations or extinguished its duty when its insured refused to cooperate, the

Court does not believe it is critical to specify, on a topic-by-topic basis, which topics involve a failure to adequately prepare and which topics concern a genuine lack of knowledge (i.e., in the words of the rule, the matters were not "known or reasonably available" to QBE).  Regardless of which scenario is involved, QBE will not be able to take a position at trial on those issues for which Mr. O'Brien did not provide testimony.

This relief is triggered either as a sanction (for failing to comply with the 30(b)(6) obligations) or as a natural consequence of not having a pre-trial position on certain topics. It would be fundamentally unfair if QBE did not provide 30(b)(6) testimony on certain matters, proclaimed a lack of its own knowledge, advocated that the association's refusal to cooperate should not impact it and then at trial take affirmative positions on these topics and seek to introduce evidence against Jorda. QBE impliedly recognized the inequity inherent in this type of trial scenario when it agreed that it would be bound by Mr. O'Brien's lack of knowledge.

Based on a thorough review of Mr. O'Brien's entire 30(b)(6) deposition transcript and the hearing transcript, the Court finds that QBE did not for certain topics adequately prepare Mr. O'Brien for his 30(b)(6) deposition, did not timely advise Jorda of Mr. O'Brien's limitations before the deposition began, and did not cause Mr. O'Brien or other QBE attorneys, employees or agents to review other documents in its possession or available to it.  By way of example only, Mr. O'Brien said he could not provide testimony about *QBE's* document retention policies (but could provide testimony about FIU's policies).   But QBE surely could have educated Mr. O'Brien on its policies so that he could speak on behalf of QBE, or it could have designated a QBE exmployee to be an additional designee.[15]

---

[15]     At the hearing, Jorda noted that Mr. O'Brien reviewed, at most, 4,000 documents out of a possible universe of almost 26,000 documents.  It is unclear whether Jorda actually intended to refer to 26,000 separate *documents* or 26,000 *pages* of documents.  Either way, its point is that Mr. O'Brien's preparation (or QBE's preparation of him) was inadequate and could have been

On the other hand, the Court acknowledges that QBE is in an inherently awkward situation.  QBE is on the horns of a dilemma because the subrogation nature of this lawsuit means that QBE  sometimes did not have the same level of knowledge as a party involved in the underlying events (e.g., QBE was not involved in the design, inspection, maintenance or repair of the air conditioning system, was not present at the insured condominium during Hurricane Katrina and has no direct knowledge of what happened or whether other third parties caused the damages or contributed to them) but must still respond to a 30(b)(6) notice requiring it to designate a representative to testify about its collective corporate knowledge.  To compound the undesirable scenario it finds itself in, QBE assumed it would be obtaining information and an appropriate designee from its insured, the condominium association, which should have some knowledge of the topics on the 30(b)(6) list but which refuses to cooperate.

Because QBE does not challenge the relief of precluding trial testimony on topics for which QBE did not provide 30(b)(6) testimony, the Court **grants** the motion to the extent Jorda seeks that remedy.  Consequently, QBE will not be able to take a position at trial – including the introduction of testimony and exhibits – on the topics listed in this Order as those on which Mr. O'Brien did not provide 30(b)(6) testimony.

The Court will also **grant** the motion by entering a costs and attorneys fee award against QBE as a sanction for not complying with its 30(b)(6) obligation.  However, the Court will not award all the fees and costs incurred by Jorda in connection with this motion because a part of

---

significantly improved had the available materials been timely reviewed.  According to Jorda, reviewing less than 20% of the available material is presumptively inadequate.  In addition, Jorda also complains that it took QBE two months to provide a date for the 30(b)(6) deposition.  Had QBE been more nimble and provided an earlier date, then the discovery deadline might not have expired by the time the motion for sanctions was filed.  In any event, neither QBE nor Jorda has filed a motion to extend the discovery deadline.  That motion would need to be filed before the Honorable Alan S. Gold, as the Undersigned does not have the authority or the inclination to unilaterally change a discovery deadline established by the district court judge.

QBE's inability to provide adequate 30(b)(6) testimony resulted from its lack of knowledge and related inability -- despite asking -- to obtain information and knowledge from an uncooperative third-party source, a scenario in which its obligations are extinguished.

The Court is "itself an expert on the question [of determining an hourly rate for attorneys fees] and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value." *Norman v. Housing Auth.,* 836 F. 2d 1292, 1303 (11th Cir. 1988).  Moreover, the Court prefers to avoid the potentially time-consuming litigation which might be generated on the purely collateral matter of the amount of the expense award under Rule 37.[16]

Therefore, the Court concludes that **$2,300.00** is an appropriate expense award for Jorda's motion for sanctions, counsel's preparation for, and attendance at, the hearing, and Jorda's filing of a supplemental post-hearing memorandum (which required a careful review of a deposition transcript in excess of 250 pages).  In fact, the Court considers this be a *conservative* estimate of the reasonable attorneys fees incurred in connection with the sanctions portion of this motion (as opposed to the Catch-22 situation where QBE lacked knowledge and could not obtain the cooperation of its insured).  In calculating the award, the Court took into consideration the

---

[16]     This expense award is not premised on a finding of bad faith.  Rather, it is merely the expense-shifting consequence which Rule 37 requires when a motion is granted and the limited exceptions are inapplicable.  Likewise, this expense award is not a disciplinary sanction against counsel.  First, it is imposed against the party, QBE, not its counsel.  Second, as noted, it is only the implementation of the mandatory expense-shifting mechanism of the Rule.  Therefore, counsel would not be required to disclose this award if asked (by, for example, an insurance carrier, a judicial nominations commission, a prospective employer, etc.) whether a court has ever imposed a disciplinary sanction on them.

fact that QBE's inability to produce a 30(b)(6) witness on all 47 topics was partially caused by its insured's failure to cooperate.[17]

─────────────────────

[17]     Jorda argues that QBE did not extinguish its obligations concerning its failure to procure testimony from its insured because it began its efforts too late, did not pursue the requested cooperation with sufficient diligence and because it failed to contact the developer.  For the most part, the Court rejects this argument.  The deposition transcript and emails demonstrate that QBE's counsel undertook efforts to obtain testimony from the condominium association before Mr. O'Brien's deposition.  In addition, the Court concludes that QBE was surprised when the insured belatedly announced, through a cryptic email from its counsel that it would not be providing a witness.

The Court also does not find fault with QBE's failure to actually file the threatened lawsuit against its insured (in order to compel the association to provide witness testimony as a designee of QBE). The rule speaks about a designee who "consents" to provide testimony on the party's behalf, and a witness who appears because of a lawsuit is likely not a witness who has provided the requisite consent.  Moreover, QBE could be at risk if it agreed to have the association select one of its employees (or officers or directors) as QBE's designee after the association were named in a QBE-initiated lawsuit.  It is not difficult to imagine a scenario where the association-selected designee would be biased against QBE and (either intentionally or subconsciously) then provide testimony which undermined QBE's litigation position.  But this potentially problematic scenario never arose because the insured condominium association never provided an appropriate witness to serve as QBE's designee after its counsel received the email threatening litigation.

Despite these risks, QBE announced its willingness to accept *in advance* an association-selected witness to be QBE's corporate 30(b)(6) designee on topics concerning the association's knowledge of the remaining topics on the list.  (ECF 93, p. 40-41).  Setting aside the issues of whether a witness produced by the association would be a sufficient 30(b)(6) designee for *QBE* (because the rule requires consent from the witness) and whether QBE might later attempt to rescind its agreement to be bound by the association's witness if the witness were to testify to matters which QBE deems to be incorrect or inconsistent with its position, QBE tried to comply with its obligation in this subrogation context by, in effect, blindly agreeing to be bound by whatever testimony the witness provided.  Under these circumstances, Jorda's claim that QBE did not diligently or adequately comply with its 30(b)(6) duty concerning its efforts to secure cooperation from its insured is unpersuasive.  *Fraser Yachts*, 2007 WL 1113251 at *2 ("there is nothing in the Rule that prohibits a corporation from adopting the testimony or position taken by other witnesses in a case").

On the other hand, QBE does not get a free pass for not bothering to contact its other insured, the *developer*. It may well be that the developer would have also refused to provide a witness to testify on QBE's behalf as a designee, but QBE should have at least made the request.  The Court has factored all of these considerations into its fees award.

The Court concludes that this amount is reasonable and fair. However, if any party objects to the amount of the award, they may, within 3 days of this Order, file a motion for an evidentiary hearing and simultaneously file as an attachment to the motion the time and billing records of all attorneys at the law firm in connection with this motion to compel. The Court will timely schedule an evidentiary hearing requested under this procedure.

QBE shall pay this $2,300 award to Jorda within 14 days of this Order.[18]

---

[18] Although QBE objects to the conclusion that *sanctions* are appropriate and also objects to an award of fees, it concedes the ultimate substantive relief concerning evidence and positions at trial. The Court appreciates QBE's candor in agreeing that it is bound at trial by the "I-don't-know" answers of its only designee and that it cannot take a contrary position at trial (because it would result in unfair sandbagging of Jorda). Judges and legal scholars have championed the wisdom of making a concession, either on the law or the facts. For example, nationally-known Seventh Circuit Court of Appeals Judge Richard Posner advises lawyers to not display a "lack of candor by refusing to make unavoidable concessions." Richard Posner, *Convincing a Federal Court of Appeals*, ABA Section of Litigation (May 2008), available at http://www.uslaw.com/library/Litigations/Convincing Federal CourtAppeals.php?item#137130 (registration required). QBE's counsel should be commended for his candid comments at the hearing.

For an entertainment-based version of this philosophy, *see The Gambler*, a song made into a hugely popular hit by singer Kenny Rogers. In that song, Mr. Rogers sings, "you got to known when hold 'em, know when to fold 'em." Kenny Rogers, The Gambler (United Artists 1978).

**VII.**    <u>**Conclusion**</u>

Jorda's motion is granted in part and denied in part.

QBE is precluded from taking a position at trial, including the introduction of testimony and exhibits, on those issues for which Mr. O'Brien was unable to provide 30(b)(6) testimony.

QBE shall pay Jorda $2,300 within 14 calendar days of this Order.

**DONE and ORDERED**, in Chambers, in Miami, Florida, this 30th day of January, 2012.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**

The Honorable Alan S. Gold

All counsel of record