UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO: 10-21107-CIV-GOLD/GOODMAN

QBE INSURANCE CORP. a/s/o BRICKELL
BAY PLAZA, LLC as Assignee of the Club
at Brickell Bay Plaza Condominium
Association, Inc.,

       Plaintiff,

vs.

JORDA ENTERPRISES,
INC. d/b/a JORDA MECHANICAL
CONTRACTORS

       Defendant.

_____/

**OMNIBUS ORDER GRANTING DEFENDANT JORDA ENTERPRISE, INC.'S
MOTION FOR SUMMARY JUDGMENT [ECF NO. 87]; REFERRING
<u>MOTION FOR SANCTIONS [ECF No. 124] TO MAGISTRATE JUDGE GOODMAN</u>**

      This cause is before the Court on Defendant Jorda Enterprise, Inc.'s ("Jorda")

Motion for Summary Judgment [ECF No. 87], filed January 5, 2012.  Plaintiff QBE

Insurance Corp. ("QBE") filed a response [ECF No. 99] on January 19, 2012, and Jorda

filed a reply [ECF No. 103] on January 30, 2012.  I held oral argument on the summary

judgment motion on March 23, 3012.  More than a month after oral argument, on April

25, 2012, QBE filed a Motion for Leave to File Supplemental Exhibits in Response to

Defendant's Motion for Summary Judgment [ECF No. 147].  Jorda responded with a

Motion to Strike and Response in Opposition [ECF No. 149], QBE responded [ECF No.

154] to the Motion to Strike, and Jorda replied [ECF No. 155].  Having reviewed the

pleadings and record, and being otherwise duly advised, I grant Jorda's Motion for

Summary Judgment for the reasons stated below.

## I.      Background

QBE filed suit against Jorda on April 7, 2010, alleging common law indemnity and equitable subrogation, and seeking damages relating to an August 26, 2005 pipe burst at the Club at Brickell Bay.  [ECF No. 1, Complaint ("Compl.").]  On August 18, 2010, upon a motion to dismiss by Jorda, I dismissed the common law indemnity claim, reasoning QBE had not pled any duty, express contract, or pre-existing legal relationship between QBE and Jorda that would give rise to a common law indemnity claim.  [ECF No. 17.]  As to the equitable subrogation claim, I held QBE's failure to bring a contractual subrogation claim did not bar its equitable subrogation claim, and allowed the latter claim to proceed.  [*Id.*]  The equitable subrogation claim is the sole claim remaining and is the subject of Jorda's Motion for Summary Judgment.

I have jurisdiction pursuant to 28 U.S.C. § 1332.  I therefore must apply the substantive law of Florida, as the state in which I sit.  *See Trailer Bridge, Inc. v. Illinois Nat. Ins. Co.*, 657 F.3d 1135, 1141 (11th Cir. 2011).  In applying Florida law, I must "decide the case in the way it appears the Florida Supreme Court would decide it."  *See KMS Restaurant Corp. v. Wendy's Intern., Inc.*, 361 F.3d 1321, 1325 (11th Cir. 2004).

## II.     QBE's Motion for Leave to File Supplemental Exhibits

Before addressing the merits of Jorda's Motion for Summary Judgment, I turn to QBE's Motion for Leave to File Supplemental Exhibits [ECF No. 147] ("Motion for Leave"), which QBE filed three months after it filed its Response to Jorda's Motion for Summary Judgment, and one month after oral argument on the Motion.  QBE seeks to supplement the record with four exhibits [ECF Nos. 147-1–147-4], all of which were public record in *Club at Brickell Bay Condominium Association, Inc. v. Brickell Bay Plaza, LLC, Beauchamp Construction Co., Inc. and Jorda Enterprises, Inc. d/b/a Jorda*

*Mechanical Contractors*, Circuit Court for the 11th Judicial Circuit in and for Miami-Dade County, Florida, Case No. 07-17728: Order Granting Motion to Compel Settlement [ECF No. 147-1], Order Denying Defendant's Motion for Rehearing [ECF No. 147-2], Notice of Joinder in Motion to Enforce Settlement Agreement [ECF No. 147-3], and Jorda Enterprise, Inc.'s Motion to Compel Compliance with Settlement Agreement [ECF No. 147-4].   Jorda does not oppose the filing of the Orders Granting Motion to Compel Settlement and Denying Defendant's Motion for Rehearing, *see* [ECF No. 149 at 12], and, noting this lack of opposition, as well as Jorda's reference to these Orders during the summary judgment hearing [ECF No. 144 at 24–25], I permit these Orders [ECF Nos. 147-1 and 147-2] to be filed and considered on summary judgment.[1]

As to the third and fourth exhibits [ECF Nos. 147-3 and 147-4] ("Supplemental Exhibits"), Jorda does object to their filing and also objects to the supplemental argument made in QBE's Motion for Leave.   It is within my discretion to deny QBE's request to supplement the record on summary judgment.   *See In re Accutane Products Liability*, 378 F. App'x 929 (11th Cir. 2010); *Ojeda v. Louisville Ladder, Inc.*, 410 F. App'x 213, 216 (11th Cir. 2010) ("Ojeda also challenges the district court's denial of his motion to file a supplemental affidavit. We review that decision only for abuse of discretion.").   Rule 6(b)(1) of the Federal Rules of Civil Procedure provides that, when a party files a motion after the time for doing so expires, a court may, for good cause, extend the time "if the party failed to act because of excusable neglect."   Fed. R. Civ. P.

---

[1] I note too that Jorda filed of record on January 5, 2012, as an exhibit to its Statement of Material Facts, the Order Granting Motion to Compel Settlement.   [ECF No. 86-11].

6(b)(1)(B); *see also Farina v. Mission Inv. Trust*, 615 F.2d 1068, 1076 (5th Cir. 1980)[2] ("[A]bsent an affirmative showing by the non-moving party of excusable neglect according to Rule 6(b) a court does not abuse its discretion when it refuses to accept out-of-time affidavits."); *Jones v. Southern Pan Serv.*, 2011 WL 2038628 (M.D. Fla. 2011) (denying motion to supplement, filed after movant filed response to summary judgment motion, where movant did not provide any explanation for the delay in providing the new exhibits).  Rule 6(b) confers discretion on the district court to accept untimely filings, but does not compel the district court to receive them.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 896 & n. 5, 110 S. Ct. 3177, 3192 & n. 5, 111 L. Ed. 2d 695 (1990).  Similar to Rule 6(b), Federal Rule of Civil Procedure 16(b) requires a party to demonstrate good cause to modify dates set forth in a scheduling order.  Fed. R. Civ. P. 16(b) ("A schedule may be modified only for good cause and with the judge's consent.").

Here, QBE provides no reason for its delay in filing the Supplemental Exhibits. QBE suggests it filed the documents "to make the record complete" [ECF No. 154 at 1], but, even if this were so, does not explain why it could not have "made the record complete" in a timely manner.  Indeed, these documents are public record and have been accessible to QBE since, at a minimum, the filing of Jorda's Motion for Summary Judgment.  Lack of diligence does not qualify as excusable neglect or good cause. *See, e.g. Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1568–69 (11th Cir. 1987); *Rogers v. Hartford Life and Acc. Ins. Co.*, Civil Case No. 12-0019, 2012 WL 2395194, at

---

[2] All cases decided by the United States Court of Appeals for the Fifth Circuit before September 30, 1981 are binding precedent in the Eleventh Circuit.  *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981).

*2 (S.D. Ala. June 22, 2012) ("[A]uthorities are legion for the proposition that attorney inadvertence, carelessness or oversight of a published deadline is insufficient, as a matter of law, to constitute "good cause" under Rule 16(b)(4)."; string citing cases holding same).

Further, the Supplemental Exhibits appear on their face to be incomplete.  The Notice of Joinder references an "Exhibit 1," which QBE does not attach, and Jorda's Motion to Compel references an "Exhibit B," which QBE does not attach, and an "Exhibit A," which QBE attaches only in part.  Filing incomplete documents unduly delays and complicates the litigation, and prejudices Jorda, who then has to respond to incomplete filings.

Finally, in presenting its argument, QBE has failed to identify the specific portions of the Supplemental Motions which would create material issues of fact.  Trial courts are not required to "search the record and construct every argument that could have been made based upon the proffered materials."  *Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1213, n. 5 (11th Cir. 1995).

As QBE has failed to (1) justify the delay in filing the Supplemental Exhibits, (2) file complete documents, and (3) explain how the Supplemental Exhibits create genuine issues of material fact, I deny QBE's Motion for Leave to File Supplemental Exhibits to the extent QBE presents additional argument and seeks to file the Supplemental Exhibits, and, correspondingly, grant in part Jorda's Motion to Strike.[3]

---

[3] Even if I granted QBE's Motion for Leave and considered the Supplemental Exhibits as evidence of record on summary judgment, my conclusions would remain the same, as none of the exhibits make Jorda a party to the Settlement Agreement in Case No. 07-17728, or alter the limited subrogation carveout in that Agreement.  Moreover, as Jorda points out, QBE has maintained in its pleadings that Jorda is not a party to the Settlement Agreement.  *See* ECF No.

### III.    Undisputed Facts

Pursuant to Southern District of Florida Local Rule 56.1,[4] Jorda filed a Concise Statement of Material Facts to Which There Exists no Genuine Issue to be Tried [ECF No. 86 ("Jorda Statement")].   QBE filed a Statement of Undisputed Material Facts in Opposition [ECF No. 98 ("QBE Statement")],[5] and Jorda filed a Reply to Plaintiff's Statement [ECF No. 102 ("Jorda Reply Statement")].   Upon review of the record, including the exhibits submitted, I conclude that the following material facts are undisputed and supported by evidence in the record.

### A.    The Parties and the Insurance Claim

On or about August 26, 2005 (the same day as Hurricane Katrina), a condominium ("Condominium") insured by QBE was damaged.  (Jorda Statement ¶ 3.) The Club at Brickell Bay Plaza Condominium Association, Inc. ("Association") was responsible for the management and operation of the Condominium and was QBE's insured.  (*Id.*)  Brickell Bay Plaza, LLC was the Condominium's developer ("Developer"),

---

98 at 2 ("Defendant is not listed as a signatory to the Settlement Agreement nor specified in the body of the agreement except when the caption of the case is noted.").

[4] In the Southern District of Florida, a party moving for summary judgment must submit a statement of undisputed facts.  *See* S.D. Fla. L.R. 56.1.  If necessary, the non-moving party may file a concise statement of the material facts as to which it is contended there exists a genuine issue to be tried.  *Id.*  Each disputed and undisputed fact must be supported by specific evidence in the record, such as depositions, answers to interrogatories, admissions, or affidavits on file with the Court.  *Id.*  All facts set forth in the movant's statement which are supported by evidence in the record are deemed admitted unless controverted by the non-moving party.  *Id.*

[5] Despite the clear requirements of Local Rule 56.1 and my Instructions for Summary Judgment Briefs [ECF No. 28], in its Statement, QBE does not state whether it disputes Jorda's facts, *see, e.g.*, QBE Statement ¶¶ 8, 25.  Further, QBE sets forth additional facts in its Response in Opposition to Jorda's Motion for Summary Judgment [ECF No. 99], *see, e.g.* QBE Response at 2, 5, 8, 10, 11, 17, without including these facts in its Statement or, in certain instances, providing citations to the evidence of record on summary judgment.  This is not proper practice in federal court, and QBE is advised to comply with all applicable rules of court.

and, in constructing the Condominium, Brickell Bay Plaza, LLC contracted with Beauchamp Construction Co. ("Beauchamp") as general contractor. (*Id.* ¶ 4.) Beauchamp, in turn, contracted with various subcontractors, including Jorda. (*Id.*)

The Association made a claim under its insurance policy with QBE, and QBE paid $100,000.00 on September 13, 2005, $228,446.40 on October 21, 2005, and $2,700,000.00 on May 6, 2009, for a total of $3,028,446.40. (*Id.* ¶¶ 5-7.) In conjunction with the September 13, 2005 payment, the Association executed a Sworn Statement in Proof of Loss for a partial claim of $100,000.00 and a Subrogation Receipt which acknowledged the receipt of $100,000.00 "in partial settlement" of its claims and subrogated its claims to QBE "to the extent of said payment." (*Id.* ¶ 9).[6] The Association also executed a Request for Advance and Agreement, wherein QBE "offered to advance $100,000.00 on the loss under the following terms and conditions: 1) that this advance shall not be considered payment under any portion of the policy, 2) that if either policy or the claim is not valid and payment is not required by us [QBE], you [the Association] will repay the advance, and 3) we [QBE], in making the advance, reserve and do not waive any right requirement under [the Policy]." (*Id.*)

As of October 16, 2005, QBE's adjustor estimated the total loss to be $1,221,908.00. (*Id.* ¶ 11.) Because there was no agreement as to the amount of loss with the Developer or the Association at that time, QBE did not pay the full estimated claim, but paid only $228,446.40 to Antol Restoration Services for water extraction. (Jorda Statement ¶ 86; ECF No. 69-1, O'Brien Dep. Tr. at 41; ECF No. 81-2 at FIU

---

[6] During oral argument, counsel for both parties agreed the $100,000.00 payment was made to the Association. March 23, 2012 Transcript [ECF No. 144] ("Tr.") at 11.

00126.)  Similar to the September 13, 2005 payment, in conjunction with the October 16, 2005 payment, the Association executed a Subrogation Receipt for the "partial settlement" of $228,446.40.  (ECF No. 81-2 at FIU 00298.)[7]  As of February 2006, QBE asserted the Association's claim had not been documented to QBE's satisfaction, and as of March 14, 2006, QBE had not reached an agreement with the Association as to the amount of loss.  (Jorda Statement ¶ 11.)  QBE was still investigating the loss claim as of May 2007.  (*Id.*)  QBE paid the claim in full when it paid $2,700,000.00 on May 6, 2009.  (*Id.* ¶ 30.)

### B.    Loan from and Assignment to the Developer

On January 25, 2006, pursuant to a Loan Agreement, the Developer gave the Association and Brickell Bay Master Association, Inc. ("Master Association")[8] a loan in the amount of $4,000,000.00 "for the purpose of funding of repairs of water damage caused to the Condominium … resulting from a broken pipe on the Condominium property on or about August 26, 2005, and for no other purpose …."  (Jorda Statement ¶ 13; ECF No. 86-1.)  The Loan Agreement was signed by the Developer, and by Phil Dahan on behalf of both the Association and the Master Association.  (ECF No. 86-1; Tr. at 15–16.)

The Loan Agreement was accompanied by a January 25, 2006 Collateral Assignment of Rights to Collect Assessments, Insurance Proceeds and Lien Rights

---

[7] Though not material, the evidence of record does not reflect whether a Request for Advance and Agreement was signed in conjunction with the October 2005 payment.

[8] The Brickell Bay Master Association, Inc. was the Condominium's master condominium association until turnover.  Tr. at 6–7.

("Assignment"),[9] which, *inter alia*, assigned to the Developer "the proceeds of all funds realized by [the Association and the Master Association] from any … insurance contracts, including … any insurance policies with QBE Insurance Group" and "the right to file … suit against QBE Insurance Group … to recover any insurance proceeds … for or in connection with the water damage sustained by the Condominium … resulting from the broken pipe on the Condominium property on or about August 26, 2005." (Jorda Statement ¶ 15; ECF No. 86-2 at 2–3; Tr. at 16–17.)  The Assignment was signed by the Phil Dahan on behalf of both the Association and the Master Association. (ECF No. 86-2.)

### C.    The Insurance Action

On or about May 25, 2007, QBE removed to the United Stated District Court for the Southern District of Florida the case styled *Brickell Bay Plaza, LLC v. QBE Insurance Corporation*, Case No. 07-21359-cv-Cooke ("Insurance Action"), in which the Developer, as assignee of the Association, sued QBE for damages resulting from the August 26, 2005 pipe burst.  (Jorda Statement ¶ 16.)  The Association intervened in the Insurance Action, alleging the Assignment from the Association to the Developer was invalid because the Association was under the control of the Developer at the time of the Assignment and directly seeking policy proceeds from QBE.  (*Id.* ¶¶ 23–24.)  In March 2008, the Association amended its intervenor complaint to assert breach of fiduciary duty and good faith and fair dealing claims against the Developer.  (*Id.*).  In its

---

[9] The parties disagree over whether this Assignment is valid.  This disagreement does not present a genuine issue of material fact because, as discussed in section IV.A. *infra*, even if it is valid, it does not assign from the Association to the Developer the equitable subrogation rights at issue here.

responses to the intervenor Association's pleadings, QBE indicated it did not object to either intervention or amendment.  (*Id.*)

QBE and the Developer settled the Insurance Action on August 25, 2008.  (Id. ¶ 28.)  The settlement terms required the Developer and the Association to provide QBE a "full release of all claims."  (*Id.*).  QBE had not received the required release by September 15, 2008, when it filed a Joint Motion to Stay the Insurance Action, stating the Insurance Action and a related state court construction action (discussed below) had settled, and requesting a stay pending the resolution of certain matters in the state court construction action.  (*Id.*; ECF No. 86-10.)  On May 6, 2009, QBE paid $2,700,000.00.[10]  (Jorda Statement ¶ 30.)  Accompanying QBE's May 6, 2009 payment was a May 8, 2009 General Release of All Claims by the Developer and the Association ("General Release"), releasing QBE from all claims related to the Insurance Case and assigning to QBE "any and all right, including subrogation, against the party/entity who installed the subject pipe and any other potentially responsible party."  (Jorda Statement ¶¶ 30–31; ECF No. 69-31.)  Though the body of the General Release referenced the Association, the General Release was signed by the Developer and Brickell Bay Condominium Association, Inc., and not signed by the Club at Brickell Bay Condominium Association, Inc.  (ECF No. 69-31 at 1, 5.)  This General Release is the only release pursuant to which QBE is suing Jorda in the present case.  (Jorda Statement ¶ 32.)

---

[10]  Though not material, the evidence of record does not indicate whether QBE paid the Developer or the Association.  During oral argument, counsel for QBE represented the payment was made to the Developer and the Association, who worked out the payments.  *See* Tr. at 19.

### D.     The Construction Action

Meanwhile, on June 13, 2007, the Association filed in the Circuit Court of the Eleventh Judicial Circuit of Florida an action against the Developer, Beauchamp, and Jorda, styled *Club at Brickell Bay Condominium Association, Inc. v. Brickell Bay Plaza, LLC, Beauchamp Construction Co., Inc. and Jorda Enterprises, Inc. d/b/a Jorda Mechanical Contractors*, Case No. 07-17728 CA 40 ("Construction Action").   (Jorda Statement ¶ 20.)   The Construction Action included allegations that the August 2005 water damage to the Condominium resulted from Jorda's negligent and deficient construction.  (*Id.*)

The Construction Action settled pursuant to a June 26, 2008 Settlement Agreement ("Settlement Agreement"),[11] which was enforced by Court order dated January 29, 2009.  (*Id.* ¶ 25; ECF Nos. 86-8, 86-11, 147-2.)  The Settlement Agreement was among the Association, the Developer, and Beauchamp.  (ECF No. 86-8 at 8.)  The Settlement Agreement did not list Jorda as a signatory.  (ECF No. 86-8 at 26; QBE Statement ¶ 25.)  Nor did the Settlement Agreement state that Beauchamp was signing for its subcontractor Jorda.  (*See generally* ECF No. 86-8.)

Pursuant to the Settlement Agreement, the Association assigned to the Developer "any claim, right[,] title and interest it may have in the insurance proceeds … in dispute … in the Insurance Action" (ECF No. 86-8 at 10, ¶ 2), agreed to dismiss with prejudice its claim for intervention in the Insurance Action (*id.*), and released the Developer from any claims relating to the Construction Action.  (*Id.* at 19, ¶ 20.)  The

---

[11] Although the Settlement Agreement [ECF No. 86-8] itself was not executed, the parties agree that this is the final settlement agreement in the Construction Action, and the date of the agreement is June 26, 2008.  Tr. at 24–25; *see also* ECF No. 147-2.

Association also released Beauchamp for any claims relating to the Construction Action, but did not release Beauchamp from "any claims sought by the Developer against QBE in the insurance action." (*Id.* at 22, ¶ 22.)   The paragraph releasing Beauchamp contained the following:   "It is expressly understood, acknowledged and agreed that nothing in this Agreement shall be interpreted to release, abolish, relinquish, discharge, satisfy or amend the QBE insurance policy or any of QBE's subrogation rights set forth therein.  To the extent any party attempts to use this Agreement to prevent an action by QBE from enforcing its rights under the Insurance Policy, then those provisions in this Agreement shall be deemed null and void and of no further force or effect."  (ECF No. 86-8 at 21–23, ¶ 22.)   The paragraph releasing the Developer contained no such provision.  (ECF No. 86-8 at 19–20, ¶ 20.)

With respect to Beauchamp, the Association also agreed that it would not file any suits against Beauchamp relating to the August 26, 2005 pipe burst, but specified that "this covenant not to sue shall not be binding upon QBE and shall not interfere with QBE's right to subrogation and Beauchamp represents, acknowledges and agrees that it will not attempt to prevent subrogation by QBE as a result of the covenant not to sue set forth in this Agreement."  (ECF No. 86-8 at 23, ¶ 23.)   The Settlement Agreement contained no such covenant not to sue and QBE subrogation carveout as to the Developer.

Finally, the Association agreed in the Settlement Agreement to dismiss with prejudice the Construction Action against "the Developer, General Contractor, and Jorda."  (ECF No. 86-8 at 11, ¶ 4; *see also* ECF No. 69-1, O'Brien Dep. Tr. at 145,

147.)[12]   On March 22, 2010, the Association filed in the Construction Action a Notice of Voluntary Dismissal of Action with Prejudice, giving "notice that it [was] dismissing this action in its entirety, with prejudice, with each party to bear its own costs and attorney's fees …." (Jorda Statement ¶ 36; ECF No. 86-11.)  The Notice of Voluntary Dismissal also contained the handwritten language that it was being filed "pursuant to the settlement agreement."   (ECF No. 86-11.)   Although Jorda was not a party to the Settlement Agreement, in reliance upon the Settlement Agreement and dismissal of Jorda with prejudice, Jorda made repairs to the subject property and agreed to forego attorneys' fees and costs in the Construction Action.  (Jorda Statement ¶ 34.)  QBE had actual notice of the Settlement Agreement as of September 15, 2008.  (Jorda Statement ¶ 29.)

## IV.   Analysis

In seeking final summary judgment against QBE, Jorda argues QBE did not perfect its equitable subrogation rights because it did not obtain a valid release from the Association.  Jorda further argues that, even if QBE perfected its claim when it made the final payment to the Association in May 2009, QBE's equitable subrogation claim is barred because the Association had previously released Jorda for all liability relating to the August 26, 2005 pipe burst.

In the alternative, Jorda argues QBE's equitable subrogation claim is barred under the principle of res judicata, as QBE's insured, from whom QBE gained its

---

[12] During oral argument, counsel for QBE agreed that the June 2008 Settlement Agreement, although not signed by Jorda, is a valid release of Jorda.  Tr. at 33 (Court: "So, from QBE's standpoint, is it your position that the June, 2008 settlement agreement, although not signed by Jorda, is a valid release of Jorda by the plaintiff?  Ms. Sims: Yes.").

subrogation rights, adjudicated on the merits a prior case related to the August 26, 2005 pipe burst and Jorda's construction and would be barred from bringing a subsequent suit relating to those claims.   Finally, Jorda argues QBE cannot bring its equitable subrogation claim because it failed to bring a timely contractual subrogation claim.

As explained herein, I conclude that QBE's equitable subrogation claim fails as a matter of law because QBE did not obtain a valid release from the Association.  I further conclude that QBE's equitable subrogation claim is barred because the earliest QBE could have perfected its subrogation claim is May 2009, when it paid the entire debt to the Association, and, by that date, the Association had released Jorda.   Finally, I conclude the instant suit is barred by the doctrine of res judicata.  As I grant summary judgment for Jorda on these three alternative theories, I do not reach Jorda's argument on summary judgment that QBE's failure to bring a contractual subrogation claim bars its equitable subrogation claim.

### A.    Perfection of Equitable Subrogation Rights: Payment and Release

"Subrogation is the substitution of one person in the place of another with reference to a lawful claim or right."  *Dade County Sch. Bd. v. Radio Station WQBA*, 731 So.2d 638, 646 (Fla. 1999) (citation omitted).  Equitable subrogation, also referred to as legal subrogation, "is not created by a contract, but by the legal consequences of the acts and relationships of the parties."  *Id.* at 646.  To maintain an equitable subrogation claim under Florida law, QBE, as subrogee, must show (1) it made the payment to protect its own interest, (2) it did not act as a volunteer, (3) it was not primarily liable for the debt, (4) it paid off the *entire* debt, and (5) subrogation would not work any injustice to the rights of a third party.  *See id.*

Jorda argues QBE could not have perfected its equitable subrogation rights until May 2009, when QBE fully satisfied its debt to the Association.  I concur.  Florida law is clear that "no right of subrogation may be claimed until the whole demand of the creditor has been satisfied."  *F.D.I.C. v. Coone*, Case No. 90–989–CIV, 1992 WL 309055, at *2 (M.D. Fla. Oct. 14, 1992) (citing *Fowler v. Lee*, 143 So. 613, 614 (Fla. 1932); *Whyel v. Smith*, 134 So. 552, 554 (Fla. 1931)); *see also Munson & Assocs., Inc. v. Doctors Mercy Hosp.*, 458 So.2d 789, 791 (Fla. Dist. Ct. App. 1984) ("[T]he right of subrogation does not exist until the entire obligation is discharged ….") (citation omitted); *Cleary Bros. Const. v. Upper Keys Marine Const., Inc.*, 526 So.2d 116, 117 (Fla. Dist. Ct. App. 1988) (citation omitted) ("[T]he right to subrogation does not arise until the entire obligation is satisfied by the subrogee.").

In the instant case, QBE did not satisfy the Association's "whole demand" until May 2009, when QBE made the third and final payment of $2,700,000.00.  *See also* QBE Response [ECF No. 99] at 4 ("Defendant argues that Plaintiff did not pay off its entire debt to the Insured until May 2009.  This is correct.").  To QBE's argument that "Plaintiff need not pay the entire amount of the Insured's claim for Plaintiff to perfect its subrogation rights," *see* QBE Response at 4, QBE is incorrect, as "[n]o rights of subrogation arise from a partial satisfaction of an obligation."  *Cleary Bros.*, 526 So.2d at 117.[13]  The case law cited by QBE provides that failure to make *any* payment to an

---

[13] QBE made partial payment and obtained "Subrogation Receipts" in September 2005 ($100,000.00) and October 2005 ($228,446.40).  Florida case law does not permit any "partial perfection" of equitable subrogation rights.  Even if it did, QBE's claim for these 2005 payments would be barred by the four-year statute of limitations on equitable subrogation claims, as suit was not filed until April 7, 2010.  *See State Farm Mut. Auto Ins. Co. v. Johnson*, 18 So.3d 1099, 1101 (Fla. Dist. Ct. App. 2009) (four-year statute of limitations period on equitable subrogation claim begins when subrogee makes payment to subrogor).  Additionally, as QBE conceded

insured bars an equitable subrogation claim, not that an equitable subrogation claim is perfected upon less than full payment. *See U.S. Fidelity & Guar. Co. v. Liberty Surplus Ins. Corp.*, Case No. 6:06-cv-1180, 2007 WL 3125065 (M.D. Fla. Oct. 24, 2007). Indeed, during oral argument, counsel for QBE agreed the case law requires "that the entire debt be paid, in order for perfection to occur." Tr. at 33. I therefore conclude that partial payment does not perfect equitable subrogation rights, and QBE could have perfected its subrogation rights no earlier than May 2009.

In addition to payment of the entire debt, Florida law requires the subrogee obtain a release from the subrogor. *Dade County School Bd.*, 731 So.2d at 647 (to pursue equitable subrogation claim, surbogee must pay off entire debt of subrogor and obtain release from subrogor); *Pacific Ins. Co., Ltd. v. Botelho, D.O.*, 891 So.2d 587, 590 (Fla. Dist. Ct. App. 2004) (holding subrogee could not establish it paid off the entire debt because subrogor would not agree to release); *see also* QBE Response at 15 ("central to the application of equitable subrogation is the securing of a release). Jorda argues QBE failed to secure a release from the Association because the May 8, 2009 General Release was executed by the Developer and Brickell Bay Condominium Association, Inc., and was not executed by the Club at Brickell Bay Condominium

---

during oral argument, if partial perfection were possible, QBE could have perfected by October 2005 a claim for only the $338,446.40 it paid as of that date. Tr. at 39.

It also bears noting that QBE is not basing its equitable subrogation claim on the Subrogation Receipts obtained from the Association in September and October 2005. Rather, QBE relies only on the General Release in the Insurance Action. *See* Complaint [ECF No. 1], ¶ 18, Exhibit B; Jorda Statement ¶ 32 (uncontested in QBE Statement).

Association, Inc.[14]   QBE relies on the body of the General Release, which specifies that both the Developer and the Association release QBE, and on the Association's prior assignment of its claims to the Developer, to argue that the General Release was a valid release on behalf of the Association.

Viewing the facts in the light most favorable to QBE, as the non-moving party, I concur with Jorda that the General Release did not release the Association's subrogation claims to QBE.   The Association did not execute the General Release, and there is no evidence of record to demonstrate that either signatory to the General Release—the Developer or Brickell Bay Condominium Association, Inc.—had the authority to execute the General Release on the Association's behalf, or to otherwise bind the Association to the General Release.   To QBE's argument that the Developer "was the assignee of the Association pursuant to a valid assignment," [ECF No. 99 at 5], I disagree, as the Association never assigned to the Developer its subrogation rights.   In the June 2008 Settlement Agreement in the Construction Action, the Association assigned to the Developer only its claims and interest in the "insurance proceeds … in dispute … in the Insurance Action."   [ECF No. 86-8 at 10, ¶ 2].   The January 2006 Assignment similarly assigned from the Association to the Developer only "the proceeds … from … insurance contracts, including … any insurance policies" and "the right to file … suit against QBE Insurance Group … to recover any insurance proceeds."   [ECF No. 86-2 at 2–3].   As of the May 2009 execution of the General Release, the Developer was not the assignee of the Association's subrogation rights pursuant to either the

---

[14] QBE agrees with Jorda that this is the only release pursuant to which QBE claims subrogation rights in this case.  *See* Jorda Statement ¶ 32 (uncontroverted in QBE Statement).

Assignment or the Settlement Agreement, and therefore cannot bind the Association to the transfer of those subrogation rights via the General Release.[15]

During oral argument, counsel for QBE argued that the General Release was signed by the president of the Association:   "It says 'on behalf of Brickell Bay Plaza Condominium Association, Inc.', but it was signed by the president of the Club at Brickell Bay Association."  Tr. at 21.  QBE presented no evidence of record to support this assertion.  Nor did QBE raise this argument in its pleadings.  [ECF No. 98 at 2–3, ¶ 31; ECF No. 99 at 5].   As QBE itself has argued, "summary judgment must be supported by actual, admissible evidence, and may not rest merely upon the bald assertions of counsel."  [ECF No. 154 at 2].  QBE has submitted no evidence of record to bind the Association to the General Release, or to create a genuine issue of material fact regarding the same, and I therefore conclude QBE's equitable subrogation claim is barred because QBE did not obtain a valid release from the Association.[16]

**B.    Dismissal of the Construction Action and Jorda's Notice of QBE's Subrogation Rights**

I turn next to whether the Settlement Agreement in the Construction Action bars QBE's equitable subrogation claim against Jorda.  Jorda argues QBE has no greater rights than its insured and its assignor, the Association, and the Association agreed

---

[15] It bears emphasizing that QBE is not proceeding in this suit as subrogee of the Developer, but only as subrogee of the Association.  *See, e.g.*, ECF No. 104 at 16.

[16] During oral argument, counsel for QBE referenced a May 2009 assignment of the subject insurance policy from the Association to QBE.  Tr. at 19, 23.  Counsel could not provide a citation to the record for this assignment, and the Court has been unable to locate such an assignment in the record.  Even if the assignment existed and is according to counsel's representations, QBE's equitable subrogation claim would be barred because of the June 2008 release of Jorda and res judicata, as discussed in sections IV.B. and C. *infra*.

through its June 2008 Settlement Agreement to dismiss with prejudice its claims against Jorda, resulting in a release of Jorda in June 2008.  [ECF No. 87 at 8].[17]  QBE does not argue in its Response that the Settlement Agreement is not a valid release of Jorda by the Association, *cf.* [ECF No. 99 at 5, n.2]; *see also* Tr. at 33, but argues its claim is not barred because Jorda had notice of QBE's subrogation claim and therefore cannot rely on the release from the insured Association.  [ECF No. 99 at 6–9].

"[A] release executed by an insured in favor of a wrongdoer generally extinguished the insurer's subrogation rights against that wrongdoer."  *Lincoln Nat. Health and Cas. Ins. Co. v. Mitsubishi Motor Sales of America, Inc.*, 666 So.2d 159, 163 (Fla. Dist. Ct. App. 1995); *see also Dade County School Bd.*, 731 So.2d at 647 (if defendant settles claim with subrogor and obtains release from subrogor, "such a release would be an affirmative defense to the equitable subrogation claim").  "[A] dismissal with prejudice is equivalent or tantamount to a release."  *Eason v. Lau*, 369 So.2d 600, 601 (Fla. Dist. Ct. App. 2978); *see also Ellis v. Weisbrot*, 550 So. 2d 15, 16 (Fla. Dist. Ct. App. 1989) (same).  However, "[a] tortfeasor cannot expect to rely on a release from the victim if he knows that equity has transferred a portion of the victim's claim of recovery into the hands of a third party who has paid a part of what the tortfeasor by rights should pay."  *Lincoln Nat. Health*, 666 So.2d at 163.  The tortfeasor's knowledge may be actual or constructive, but Florida law is specific that the knowledge must be of the insurer's *perfected* subrogation rights.  *See, e.g.*, *Dadeland Dodge, Inc. v. Am. Vehicle. Ins. Co.*, 698 So.2d 929, 931 (Fla. Dist. Ct. App. 1997) ("The tortfeasor

---

[17] Although the Notice of Voluntary Dismissal with Prejudice was not filed until March 2010, the Settlement Agreement, dated June 26, 2008, provided for the Association's release of Jorda.

must have knowledge of the insurer's perfected subrogation rights."); *Lincoln Nat. Health*, 666 So.2d at 163 (agreeing with rule that a settlement cannot act as a bar to an action for subrogation if, prior to the settlement, the tortfeasor learns of the insurer's perfected subrogation rights); *Ortega v. Motors Ins. Corp.*, 552 So.2d 1127, 1128 (Fla. Dist. Ct. App. 1989) ("Because the tortfeasor had knowledge of [the insurer's] perfected subrogation rights when [the insured] executed the releases, he was estopped from raising those releases as a defense to [the insurer's] action."); *see also U.S. Fidelity & Guaranty Co. v. Liberty Surplus Ins. Corp.*, Case No. 6:06-cv-1180, 2007 WL 3125065, at *4 (M.D. Fla. Oct. 24, 2007) (applying Florida law, "[t]he fact that some Florida courts permit filing of *contingent* subrogation claims in no way suggests *unperfected* subrogation claims survive a release executed by the insured") (emphasis in original).

In the instant case, because of the payment schedule, the earliest QBE could have perfected its subrogation rights is May 2009.  Thus, Jorda could not have had notice of any *perfected* subrogation rights as of the Association's June 2008 release of Jorda.  *See* O'Brien (QBE corporate representative) Tr. 151:4-11 (Q: …what evidence is there that on June 26, 2008, Jorda knew that QBE had already paid the insured when it settled with the insured? … A: Well, there isn't any knowledge that … we had paid the entire amount because we hadn't paid it at that point in time.").

Additionally, in its Statement of Undisputed Material Facts in Opposition, QBE has pointed to no evidence suggesting Jorda had notice of QBE's subrogation interest by June 2008.  *See* QBE Statement ¶ 35.  Rather, QBE cites the deposition of Jorda's corporate representative Jorge Guisasola, in which Mr. Guisasola testified he did not know whether QBE would be pursuing a subrogation claim against Jorda, he was not familiar with letters to Jorda's insurer indicating QBE was pursuing subrogation rights

against the insurer, and, although he eventually became aware that a claim was being made against his insurance company, he did not know the date that he became aware of the claim. *See* Guisasola Tr. [ECF No. 98-2] 46:5-17, 48:4-12. QBE provides no case law or analysis to support its argument that notice to an insurer may be imputed to its insured, and, with all inferences in favor of QBE, this deposition testimony does not create a genuine issue of material fact as to whether Jorda had actual or constructive knowledge of QBE's perfected subrogation rights in June 2008.

To QBE's argument that Jorda had knowledge of QBE's subrogation rights because Jorda was performing work at the property, was privy to communications regarding the insurance claim, and was involved with litigation with the Association around the same time QBE was involved with litigation with the Association, *see* QBE Response at 8, QBE cites no evidence to support these allegations in either its Statement of Undisputed Material Facts in Opposition or its Response In Opposition to Jorda's Summary Judgment Motion, as required by Southern District of Florida Local Rule 56.1 and my Instructions for Summary Judgment Briefs [ECF No. 28]. Failure to comply with the local rules and my previous order authorizes the striking of QBE's argument. *See, e.g.*, *Gonzalez v. Ohio Cas. Ins. Co.*, Case No. 07-CV-13921, 2008 WL 4277258, *1 (E.D. Mich. Sept. 17, 2008) (striking summary judgment motions for failure to comply with local rules). Additionally, QBE does not explain how knowledge of an insurance claim translates to notice of perfected subrogation rights. QBE's argument that Jorda was on notice of QBE's subrogation claim "within weeks of the loss" [ECF No. 99 at 8] also fails on the merits, as Jorda's corporate representative testified Jorda

had completed all work on the subject property, including punch list work, by August 26, 2005. *See* Guisasola Tr. [ECF No. 98-2] 19:3-9; 40:2-4.[18, 19]

Finally, QBE argued for the first time at oral argument that the June 2008 Settlement Agreement and corresponding Notice of Dismissal Without Prejudice did not release Jorda from the instant litigation because those documents explicitly carved out QBE's subrogation rights against Jorda. Tr. at 25–28.[20] QBE did not present this theory in its Response to Jorda's Motion for Summary Judgment, and without any written notice to Jorda or the Court, sandbagged both with the new theory at oral argument. QBE's argument is untimely and QBE is barred from raising it. *See e.g., United States v. Day*, 405 F.3d 1293, 1294 n. 1 (11th Cir. 2005) (issues and contentions raised for first time in reply brief are deemed waived or abandoned); *Bakri v. City of Daytona Beach*, 716 F.Supp.2d 1165, 1173 n. 4 (M.D. Fla. 2010) (rejecting theory raised for the first during oral argument on summary judgment motion as, *inter alia*, untimely).

---

[18] Moreover, QBE has argued throughout this case that QBE itself did not know it would be pursuing an equitable subrogation claim against Jorda [ECF No. 114 at 11 ("[N]o reasonable argument can be made that the Plaintiff knew or should have known of impending litigation with the Defendant.")]. QBE cannot now take the inconsistent position that Jorda had notice of an equitable subrogation claim that QBE itself did not know it was going to file.

[19] This work does not include work performed pursuant to the Settlement Agreement after the Association released Jorda. *See* Artzt Tr. [ECF No. 84-1] at 58, 64–66, 70, Exhibits 24–26.

[20] QBE did not raise this argument in its Response [ECF No. 99]. In its Statement of Undisputed Facts [ECF No. 98], QBE stated the Motion to Enforce Settlement Agreement notes that the agreement was modified "to protect QBE's subrogation rights" [ECF No. 98 at 2, ¶ 25], but QBE did not cite to any provision of the Settlement Agreement carving out QBE's subrogation rights, or argue the rights were carved out as to Jorda.

Even if QBE's argument were timely presented, it fails on the merits.  As an initial matter, as QBE concedes, *see* ECF No. 98 at 2, Jorda is not a party to the Settlement Agreement.  Jorda therefore cannot be bound by the terms of the Agreement.

Additionally, the plain language of the Settlement Agreement does not carve out any QBE subrogation rights against Jorda.  The Settlement Agreement released both the Developer (paragraph 20) and Beauchamp (paragraph 22) from any claims in the Construction Action.  The paragraph releasing Beauchamp specifically did not release Beauchamp from "any claims sought by the Developer against QBE in the insurance action," and further stated,

> "It is expressly understood, acknowledged and agreed that nothing in this Agreement shall be interpreted to release, abolish, relinquish, discharge, satisfy or amend the QBE insurance policy or any of QBE's subrogation rights set forth therein.  To the extent any party attempts to use this Agreement to prevent an action by QBE from enforcing its rights under the Insurance Policy, then those provisions in this Agreement shall be deemed null and void and of no further force or effect."

The paragraph releasing the Developer contained no such provision.  Further, the covenant not to sue, located in paragraph 23, pertained to Beauchamp only, carved out QBE's right to sue Beauchamp only, and stated Beauchamp only may not attempt to prevent subrogation by QBE.  (ECF No. 86-8 at 23, ¶ 23.)

Neither party argues that the Settlement Agreement is ambiguous.  Rather, Jorda and QBE disagree on the meaning of the unambiguous subrogation carveout, namely whether the carveout applies only to Beauchamp, or also to QBE's subrogation claim against Jorda.

"The interpretation of a contract, including whether the contract or one of its terms is ambiguous, is a matter of law …."  *Real Estate Value Co., Inc. v. Carnival Corp.*, --- So.3d ----, 2012 WL 2327767, at *3 (Fla. Dist. Ct. App. June 20, 2012).  "In the

absence of some ambiguity, the intent of the parties to a written contract must be ascertained from the words used in the contract, without resort to extrinsic evidence." *Id.* "[T]he meaning of a contract is not to be gathered from any one phrase or paragraph, but from a general view of the writing as a whole, with all of its parts being compared and construed, each with reference to the others" *Gowni v. Makar*, 940 So.2d 1226, 1229 (Fla. Dist. Ct. App. 2006). "As a general proposition, the use of different language in different contractual provisions strongly implies that a different meaning was intended." *Fowler v. Gartner*, 89 So.3d 1047, 1048 (Fla. Dist. Ct. App. 2012).

Here, I concur with the parties that the Settlement Agreement's subrogation carveout is unambiguous. Heeding the principles of contract interpretation set forth above, I conclude the inclusion of the subrogation carveout in paragraph 22, but not in paragraph 20, reflects the parties' intent that the carveout apply to Beauchamp only. Paragraph 23, containing a covenant not to sue Beauchamp and specifying that Beauchamp only shall not interfere with QBE's right to subrogation supports that interpretation.

Perhaps recognizing that the Settlement Agreement carved out QBE's subrogation rights as to Beauchamp only, QBE, during oral argument, argued Jorda was Beauchamp's agent and/or in privity with Beauchamp, and therefore the subrogation carveout for Beauchamp applied to Jorda as well. QBE did not present this argument in its papers and presented no evidence of record on summary judgment to support its argument. Further, the Settlement Agreement does not state that Beauchamp was signing in this capacity for Jorda.

More importantly, even if the carveout applied to Jorda as well as Beauchamp, the subrogation carveout would not include QBE's equitable subrogation claim.

Paragraph 22 carves out only "the QBE insurance policy or any of QBE's subrogation rights set forth therein" and QBE's enforcement of "its rights under the Insurance Policy."  QBE's instant subrogation claim is not a contractual subrogation claim set forth in the policy (indeed, such a claim would be time barred), but rather an equitable subrogation claim.  *See* QBE Response at 17 (explaining how equitable subrogation claim is distinct from a contractual subrogation claim).  It follows that, even if the subrogation carveout in paragraph 22 applied to Jorda, it would not apply to the instant equitable subrogation claim.[21]   In sum, with respect to the release of Jorda by the Association, I conclude QBE's equitable subrogation claim must be dismissed as a matter of law because (1) QBE did not perfect its subrogation rights prior to its insured releasing Jorda, (2) Jorda did not have notice of QBE's perfected subrogation rights before it was released, and (3) the Settlement Agreement did not carve out QBE's equitable subrogation claim against Jorda.[22]

## C.    Res Judicata

Jorda alternatively argues the principles of res judicata bar QBE from bringing its equitable subrogation claim, as, following the Construction Action, the Association

---

[21]  Even if the Settlement Agreement carved out QBE's equitable subrogation claim against Jorda, the Notice of Voluntary Dismissal with Prejudice, dated March 22, 2010, released Jorda before QBE filed the instant suit (April 7, 2010) and put Jorda on notice of its subrogation claim against Jorda.  Although the Notice contained the handwritten language "pursuant to the settlement agreement," this handwritten language merely indicates the Notice was being filed pursuant to the Settlement Agreement's requirement that the Association dismiss the parties in the Construction Action with prejudice, and does not limit the scope of the dismissal.

[22]  Though not essential to my analysis, I further conclude that allowing QBE to maintain an equitable subrogation claim would serve an injustice to Jorda.  Although not a party to the Settlement Agreement, in exchange for its dismissal with prejudice from the Construction Action, Jorda performed repairs on the subject property and waived fees and costs in the Construction Action.  In light of this consideration, subrogation would work an injustice to Jorda.

would be barred from bringing the equitable subrogation claim against Jorda, and, QBE, as subrogor of the Association, cannot have rights greater than the Association.  In order for res judicata to serve as a bar to subsequent suit under Florida law, four identities must be met: (1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of persons and parties to the action; and (4) identity of quality in persons for or against whom the claim is made.  *Certex USA, Inc. v. Vidal*, 706 F.Supp.2d 1291. 1293 (S.D. Fla. 2010) (citing *The Fla. Bar v. St. Louis*, 967 So.2d 108, 119 (Fla. 2007)).  QBE contends there is no identity of parties or causes of action, and res judicata would serve an injustice to QBE.

### 1.    Identity of Parties

Turning first to the identity of parties, I conclude QBE (as subrogee) and the Association (as subrogor) satisfy the identity of parties requirement for the *defensive* application of res judicata.[23]  "[T]he term parties as used in the doctrine of res judicata includes parties and their privies."  *Jones v. Bradley,* 366 So. 2d 1266, 1267 (Fla. Dist. Ct. App. 1979); *see also Trucking Employees of North Jersey Welfare Fund, Inc. v. Romano*, 450 So.2d 843, 845 (Fla. 1984), *superseded by statute on other grounds*, ("[T]he well established rule in Florida has been and continues to be that collateral estoppel may be asserted only when the identical issue has been litigated between the same parties *or their privies.*" (emphasis added)).  While "[t]here is no generally

---

[23] Prior to the March 23, 2012 oral argument, I issued an order [ECF No. 127] highlighting what appeared to be disagreement between the Third (*Amador v. Hernandez*, 548 So.2d 849 (Fla. Dist. Ct. App. 1989)) and Fourth (*Jones v. Bradley*, 366 So. 2d 1266, 1267 (Fla. Dist. Ct. App. 1979)) District Courts of Appeal regarding the application of res judicata to a subrogee.  Having reviewed the parties' positions at oral argument and the relevant case law, I conclude there is no split as to the application of defensive res judicata or collateral estoppel to a subrogee.  I do not reach in this case the offensive use of res judicata or collateral estoppel against a subrogee.

prevailing definition of privity which can be automatically applied to all cases involving the doctrine of res judicata, … it may be said that such privity involves a person so identified in interest with another that he represents the same legal right." *Thompson v. Haynes*, 249 So.2d 69, 71 (Fla. Dist. Ct. App. 1971) (citing 46 Am.Jur.2d, Judgments, Sec. 532). "[P]rivity denotes mutual or successive relationship to the same right of property, so that a privy is one who, after the commencement of the action, has acquired an interest in the subject matter affected by the judgment through or under one of the parties, as by inheritance, succession, purchase, or assignment." *Id.*

Here, although QBE and the Association are not identical, the identity of parties requirement is satisfied because QBE, as the Association's subrogee, is in privity with the Association. *See Jones*, 366 So.2d at 1267 (holding, in context of defensive application of res judicata, subrogee is in privity with subrogor). As a subrogee, QBE stands in the shoes of its subrogor: QBE is entitled to all of the rights of its subrogor, and QBE suffers all of the liabilities to which the subrogor would be subject. *See, e.g., Royal Admin. v. Hanover Life Reassurance Co.*, 848 So.2d 1244, 1246 (Fla. Dist. Ct. App. 2003) (in equitable subrogation case, "[i]t is true that as a subrogee, Royal succeeds to the burdens of Sterling's 'treaties' with the reinsurers, as well as to their benefits." (citation omitted)); *Cleary Bros.*, 526 So.2d at 116; *Jones*, 366 So.2d at 1267; *Holyoke Mutual Ins. Co. v. Concrete Equip.*, 394 So.2d 193, 197 (Fla. Dist. Ct. App. 1981) ("The subrogee inherits … an impediment to the cause of action …." (citation omitted)). Accordingly, QBE's "legal right" is one and the same as the Association's, and if the Association is barred by the principle of res judicata from bringing the instant suit, so too is QBE. *See Gould v. Weibel*, 62 So.2d 47, 49 (Fla. 1952) (in suit by insured against tortfeasor, "The judgments in the instant suits will be final and

conclusive and will bar any further action on the same claim by either the plaintiffs or the insurers, even though the insurers had not been joined as parties plaintiff."); *Massey v. David*, 831 So.2d 226, 233, n. 12 (Fla. Dist. Ct. App. 2002) ("An insurer may be a virtual party to a lawsuit involving its insured where their interests coincide.  In such cases, a judgment in favor of the insured may redound to the insurer's benefit, even though the insurer was not a named party." (citations omitted)); *Auto-Owners Ins. Co. v. Atlantic Nat'l Ins. Co.*, 207 So.2d 329 (Fla. Dist. Ct. App. 1968) (holding insurer was estopped from relitigating liability determination against its insured).

### 2.    Identity of Causes of Action

QBE additionally argues the causes of action in the Constriction Action and the instant suit are not identical because the claim in the Construction Action sounded in negligence and involved a breach of statutory warranties.  During oral argument, QBE elaborated that the Construction Action was not a lawsuit "for negligence of a water pipe; it was a lawsuit against the developer, contractor, and the contractor's subs for improper workmanship throughout the properties."  Tr. at 58.  I disagree.

Identity of causes of action is not defined by the relief sought.  Rather, it "is defined by similarity of the facts essential to the maintenance of both actions."  *Pumo v. Pumo*, 405 So.2d 224, 226 (Fla. Dist. Ct. App. 1981).  Furthermore, res judicata applies not only to claims that were litigated in the prior proceeding, but also to "claims that *could have been raised* in the former proceeding."  *In re Senate Joint Resolution of Legislative Apportionment 2-B*, 89 So.3d 872, 884 (Fla. 2012) (emphasis in original).

In the Construction Action, the Association (1) alleged that Jorda breached implied warranties of fitness by, *inter alia*, improperly installing "condenser water pipes, and brackets and supports for such pipes" [ECF No. 86-5 at 16] and (2) sought

damages including those incurred "as a result of a major water leak incident in August 2005, caused by construction deficiencies in work or materials supplied by Jorda." [ECF No. 86-5 at 16–17].  Facts regarding the Jorda's installation of the water pipes and the August 2005 leak were essential to both the Construction Action and the present suit, and the Association could have raised a negligence claim against Jorda in the Construction Action.  The identity of causes of action requirement is thus met.

### 3.    Injustice to QBE

Finally, QBE argues res judicata should not be followed because it would work an injustice to QBE.  [ECF No. 99 at 9].  QBE was aware of the Association's dismissal of the Construction Action and release of Jorda when it paid the Association's insurance claim in May 2009.  On these facts, I conclude there is no injustice in deciding not to give QBE, as subrogee of the Association, two bites at the apple, and I conclude the doctrine of res judicata bars QBE's equitable subrogation claim against Jorda.

## V.    Conclusion

As explained herein, I conclude QBE's equitable subrogation claim is barred on three alternative bases: (1) QBE did not obtain a release from the Association, as required by Florida law; (2) QBE's subrogor, the Association, released Jorda, and Jorda did not have notice of QBE's perfected equitable subrogation claim before such release; and (3) the principle of res judicata bars the instant suit.  I therefore grant final summary judgment in favor of Jorda and against QBE.

Still pending in this matter is Jorda's Motion for Sanctions [ECF No. 124], in which Jorda seeks sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927.  I originally referred the Motion for Sanctions to Magistrate Judge Goodman [ECF No. 128], but, recognizing that the Motion for

Sanctions raised as a basis for sanctions some of the legal issues raised in the Motion for Summary Judgment, including the application of res judicata and whether QBE obtained a release from the Association, I withdrew the reference [ECF No. 158]. Having ruled on these legal matters and reviewed Jorda's Motion for Sanctions and related pleadings [ECF Nos. 124, 133, 145], I conclude Jorda has raised sufficient grounds to warrant further investigation and a hearing on whether Rule 11 and § 1927 sanctions are appropriate.  *See Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1242 (11th Cir. 2006) ("Plainly, an attorney threatened with sanctions under § 1927 is entitled to a hearing." (citation omitted)).  I therefore refer the Motion for Sanctions to Magistrate Judge Goodman to conduct a hearing and issue a Report and Recommendation.

Accordingly, it is hereby ORDERED and ADJUDGED as follows:

1. Defendant Jorda Enterprise, Inc.'s Motion for Summary Judgment **[ECF No. 87]** is **GRANTED**.

2. Plaintiff QBE Insurance Corp.'s Motion for Leave to File Supplemental Exhibits **[ECF No. 147]** is **GRANTED** in part and **DENIED** in part, as provided herein.

3. Defendant Jorda Enterprise, Inc.'s Motion to Strike **[ECF No. 149]** is **GRANTED**.

4. Pursuant to 28 U.S.C. § 636 and the Magistrate Rules of the Local Rules of the Southern District of Florida, Defendant Jorda Enterprise, Inc.'s Motion for Sanctions **[ECF No. 124]** is **REFERRED** to United States Magistrate Judge Jonathan Goodman for a hearing and Report and Recommendation, and to take all other necessary and proper action as required by law.

5.      The Court will enter final judgment pursuant to Rule 58 of the Federal Rules of

Civil Procedure upon resolution of Defendant Jorda Enterprise, Inc.'s Motion for

Sanctions.


        DONE AND ORDERED in Chambers at Miami, Florida, this 6th day of August,

2012.

_____
THE HONORABLE ALAN S. GOLD
UNITED STATES DISTRICT COURT JUDGE

cc:    Magistrate Judge Jonathan Goodman
       All Counsel of Record